* W. W. ROLLINS v. THE EASTERN BAND OF CHEROKEE INDIANS.

*Cherokee   Indians—Jurisdiction.*

The Cherokee Indians in this state have been placed upon the same footing with other tribes by an act of congress, passed in pursuance of the power granted by the constitution in reference to " regulating commerce with foreign nations among the several states, and with the Indian tribes "; and their contracts made with the plaintiff to prosecute and collect claims alleged to be due them, cannot be enforced against them in a state court, without the consent of congress.  The jurisdiction to determine such matters is lodged in the Interior Depart ment.

CIVIL ACTION tried at Fall Term, 1880, of BUNCOMBE Superior Court, before *Gilmer, J.*

This action was broght by the plaintiff against Enola or " Black Fox," Swanooka or " Flying Squirrel," John Ross

---

* Ruffin, J., did not sit on the hearing of this case.

and Lloyd R. Welch, chiefs and head-men of the eastern band of Cherokee Indians, and about two thousand other Cherokees, whose names are unknown to the plaintiff, and who are too numerous to be made parties, but who have a common interest with the above named defendants in the matters involved in this litigation. These Indians live in the counties of Cherokee, Graham, Swain, Macon and Jackson, and a few families in Georgia, and Tennessee.

The suit is brought upon a contract made in pursuance of a series of resolutions, in substance as follows:

CHEOAH COUNCIL GROUNDS, October 9th, 1872.

Whereas, it is the sense of this council to employ some discreet person to prosecute all claims of the Eastern Band, or North Carolina tribe of Cherokee Indians, against the government of the United States at Washington, arising under different treaties and laws, from the year 1783 to the present time: Now therefore be it resolved,

1. That John Ross, chief, be authorized to employ some discreet and trusty person to have custody of and prosecute said claims for "Reservations, Spoliation, and Pre-emptions" under the treaties of 1817 and 1819—the payments provided for by the treaty of 1835.

2. To assert and establish before the proper authorities of the United States all claims arising under said treaty and the provisions of an act of congress, approved July 29, 1848.

3. To collect for said tribe such moneys as they are entitled to from a fund derived from the sale of lands, known as the "neutral lands"—the Cherokee strip in the state of Kansas, and other lands, as per treaty of July 19th, 1866; and also, whatever may be due on account of misappropriations of the fund of five millions of dollars, set apart as well for said tribe, as for those of the Cherokee Nation who removed to the west by virtue of the treaty of 1835, which claims are yet unadjusted; and also, to procure payment of

so much of an appropriation, now in the Interior Department, as said tribe may be entitled to, under the act approved May 29th, 1872.

4. That John Ross be, and he is hereby instructed to contract with some competent person to carry out the intentions and purposes of this council; provided that the person selected shall not be allowed more than twenty-five per cent. as compensation for his services, and that the contract shall be approved by the Secretary of the Interior, and the Commissioner of Indian Affairs, as required by the act of Congress of May 21st, 1872, regulating the mode of making private contracts with Indians, and that a copy of these resolutions shall accompany the contract.

> (Signed) JOHN ROSS, Principal Chief,
> DAVID ADAMS, Clerk of Council.
> DAVID TUCKER, Interpreter.

Witnesses:
JOHN G. LATHAN,
JAMES TAYLOR.

Accordingly, John Ross selected the plaintiff, Rollins, and entered into a contract with him on the 15th of May, 1874, to continue four years from date. The stipulations in the contract, in reference to the prosecution of the claims mentioned in the above resolutions, and the attention to be given by the plaintiff to the business of the Cherokees, material to the case, are incorporated in the opinion of this court. The contract is signed by Jooojoudtjotb and Jdg. F. Paa, in behalf of the tribe, and by W. W. Rollins, the plaintiff.

And another contract of same date was also entered into with the plaintiff, the terms of which are similar to the above, and signed by the following chiefs and "head-men" of the tribe, namely, Swañooka, Euola, Big Witch, Osanoh, John Jackson, Jonny Light, Jackson Blythe, James Blythe,

Tom Skella, Wilson Wolf, Young Squirrel, Hugh Lambert, (his x mark), Sau-ya-ta-owl, Wilson Newcomer, Jim Boss, Jo. Welch, Tauquetla, Chequellette, Minx, Long Bear, Will Peckerwood, and Johnson Graybeard.

The matters of difference involved in the suits pending in the United States circuit court, before *Dick, J.,* at Asheville, in which the said Cherokees were plaintiffs and their agents defendants, were at May term, 1874, referred to Rufus Barringer, John H. Dillard and Thomas Ruffin, whose award, submitted on the 23rd of October following, was to be a rule of court.

In their report, the arbitrators say : We, having taken upon ourselves the burden of this reference, and having considered the pleadings, proofs, &c., in said suits, and heard the arguments of counsel, do make and publish our award in writing, of and concerning all the several matters referred to us, in the manner following :

1. That William H. Thomas became, and was the agent of the Eastern band of Cherokee Indians, living in North Carolina, after the removal of their brethren west in the year 1838, and as such undertook to purchase and did purchase for them land (hereinafter described) with money coming from the United States under treaties and the laws of Congress; and did also from time to time, buy lands from various persons, for them as a tribe or community, being a large tract carved up into towns, and situated on Soco creek and Ocona Lufta river, and their tributaries, and known as "Qualla Boundary":

Beginning at a stump near the spring on the Jackson county ine at the head of Jonathan creek, where the Soco road crossesl the mountain ; thence northerly with said county line to the ridge which divides the waters of Raven's fork from Bradley's or west fork of the Ocona Lufta river, thence with the

water-shed of that ridge to the Hughes line; thence east-wardly with said line and the lines of Enloe to Ocona Lufta river, and down the river to the southern boundary of Samuel Monteith, and across the river with Monteith's line to his southwest corner; thence with the lines of an entry made by said Thomas, and other lines of Thomas, keeping on the outside lines, to the dividing ridge between the waters of Adams' creek and Newton's mill creek, so as to include all the Indians living on the head waters of Adam's creek; thence in a southerly direction to Sherrill's line, and with the same to Ocona Lufta river, so as to include all the Indian settlements on the east side of Newton's mill creek; thence with and across the Ocona Lufta to the upper boundary of J. M. Bird, and with his line to the corner of the first tract of what is known as the "state surveys," and up said river with the line of said survey, (but excluding the tract occupied by Gibbs, and some of the Thomas entries); thence up the river to a tract occupied by an Indian named Ah-ma-cha-ma, and with the line of that tract and including the same, to the old line of Scroop Enloe, and including the tract occupied by Mason Reckley; thence with the line of his tract, crossing the Soco river below his (Reckley's) house, to the old Enloe line; thence with the same to Thomas' mill tract; thence with the line of the mill tract and of an entry (Thomas' 500 acre entry, but leaving it outside) to the line of J. B. Sherrell; thence with his line to a tract conveyed by J. W. King to Flying Squirrel; thence with the line of that tract, so run as to include it, to Thompson Carter's tract, and with the same, including it, to the top of the ridge between Soco creek and Shoal creek; thence with the water-shed of the ridge to the south corner of the "Cathcart survey," and with its line to the beginning at the head of Jonathan creek.

2. That within the Qualla Boundary, said Thomas at divers times sold and conveyed tracts of land to the following

named Indians, or persons of Indian blood: To Enola or "Black Fox," forty acres; to One-tah, thirty-three acres; to Standing Wolf and children, two hundred and eighty-six acres; to Catalaska, three tracts, containing together one hundred and ten acres; to Charlie Hornbuckle's heirs, one hundred acres; to Salo-lu-netah, or "Young Squirrel," fifty-three acres; to Nellie Jonnson, two hundred acres; and to Jimmy Reed, two hundred acres; and received from them, respectively, the purchase money.

3. And he contracted in writing to sell other tracts in the Qualla Boundary to the following named Indians: To Chu-lo-gu-lah, of "Cloud," fifty acres; to Wilson Oocummah, two tracts—one of twenty acres, and the other known as the "Cayuatago tract"; to the heirs of Jeff. Hornbuckle, two hundred acres; to Swanooka, the lands surveyed by Dills, being a part of the "Holland old field"; to Ben Quain, fifty acres, where he lives; to the heirs of Long Blanket, the tract on which they live; to the heirs of Little Witch, the place where they live; to Wilson Wolf, the mill-tract, purchased of Abraham Mungus; to Ta-a-kah, the "Thompson place" tract; to Wilson Reed, one hundred and twenty-five acres, surveyed to him by Terrell; to Standing Water, the place where he lives; to Ta-ya-hah, a part of the "Holland old field"; to Tah-gul se-nah, the tract occupied by him; and received from them, respectively, in whole or in part, the purchase money.

We do therefore award that the Qualla Boundary belongs to, and shall be held by the Eastern Band of Cherokee Indians, living in North Carolina, as a tribe or community, whether living at this time at Qualla, or elsewhere in the state; and that the individual Indians, above named, as holding under said Thomas, either by deed or contract, shall hold and possess their several tracts of land, as their separate property, with the quality of being inheritable, but without the power of alienation, except from one Indian to

another, and then only with the assent of their council, and to be subject to the payment of a sum of money, hereinafter provided for.

4. We find that the wife and children of an Indian, named "Little John," have a deed to a tract of land, containing one hundred and seventy-three acres, lying on the Tuckaseegee river and outside of the Qualla Boundary, upon which they live; and we award that the same is a good title, as against all parties and privies to these suits. We also find that they have a title-bond from said Thomas for a hundred acres lying on both sides of Skeekee branch, and have paid for the same; also, that the heirs of Will-gees-ka have a similar bond for the tract on which they live, on the south side of the Tuckaseegee, and have paid for the same; and we therefore award that the defendants convey the said tracts to them.

5. We find, that at one time it was contemplated between Thomas and the Indians living in the region, described in the pleadings as "Cheoah," to make a similar purchase of a general boundary of land in that section of the state, and that there was a written agreement to that effect between them; but afterwards the Indians declined to furnish the funds necessary thereto; and we therefore award that the said agreement to make the purchase was abandoned, and in lieu thereof, the following individual Indians made separate purchases from Thomas and others, paid the money, and have sufficient titles: Sakah, one hundred acres in district No. 9, section 589; Corn-Silk, same number in section 347, and also, the same in district No. 10, section 374; Chick-a-lilla, same number in No. 9, section 393, and also, an adjoining tract of forty-eight acres; Walla-na-kah, one hundred acres in district No. 10, section 552; Ches-que-ne-tah or "Young Bird," (son of Ty-al-ta) same number in district No. 9, section 364; Tom Big-Meat, the same, section 359, and also 90½ acres, section 360; and Con-na see-yah, one

hundred acres in district No. 10, section 386. We therefore award that they have and hold title in fee, as against all parties and privies to these suits.

We also find that the following who have title-bonds from Thomas, having paid the purchase money, are entitled to, and we award, specific performance: Ka-yu-ka, or " Ground Squirrel," two hundred and eighty acres in district No 10, section 23, Cherokee county, and James Taylor, district No. 7, in Cherokee county, Nos. 19, 21 and 27. And also, that the following have contracts in writing, and are entitled to deeds upon payment of purchase money: Dick-a-gees-Kus' heirs, one hundred acres in district No. 9, section 367; Oo-tal-ka-nah, same, section 373; Chin-a-que, or " John Owl," the land on which he lived in 1855, in Cherokee county, excepting all mineral interests; Too-way-al-lah, part of No. 12, district No. 10; Corn Silk, one hundred acres in district No. 9, section 588; Tracking-Wolf, same, section 404; Richard Henson and others, and their heirs two hundred and ten acres in district No. 5, section 11, and Richard Henson, one hundred and fifty-seven acres in same district, section 14, with a bounty claim of twenty-seven hundred acres; Salkenah and others, eighty acres in district No 6; Tes-a-tees-kah, one hundred acres in district No. 9, and George Oo-yah-ste-ah, same, section 365, and Cah-nah-a-to-go and others, same, section 405; Coheloskah, one hundred and twenty acres, same district, section 93; and no districts or sections are given to Too-nah-lu-yah, Chess-gul-ne-tah, or Tetal-ka-nah. And if the parties fail to pay the purchase money, the said Thomas shall have the right to sell the lands according to law.

6. We find that in the course of the agency of Thomas, he received large sums of money from the sale of lands in Qualla, in contributions of individual Indians, and in payments by the government; and on the other hand, the tribe became largely indebted to him for services rendered in

their behalf, and by his furnishing them through a series of years with clothing, food, farming implements and other necessary supplies; and after adjusting all claims between them (except as hereinafter mentioned) we find they owe him a balance towards the purchase money of the Qualla. Boundary, of $18,250; that after the purchase of the same by defendant, Johnston, under his execution against Thomas, the plaintiffs in pursuance of a contract with Johnston for the redemption of the lands, paid to him, on the 29th of September, 1869, the sum of $6,500, which we award Johnston shall apply as a credit on his judgment against Thomas, as money paid by the plaintiffs on account of the balance due of the purchase money, as aforesaid, which with interest thereon reduces said balance to $9,764, and this amount was further reduced by the arbitrators to $7,066.11, (by reason of a payment to Thomas in the matter of the suit upon a bond of defendant Terrell and his sureties), who awarded that on payment by the Indians to Johnston of this last mentioned sum, he should credit it on his judgment against Thomas, and that then they should have an equity to demand and have of Johnston a conveyance of the legal title to Qualla Boundary.

7. The arbitrators then say: Wishing to secure repose of titles, and to end litigation between the parties, we have considered all claims between the plaintiffs as a tribe, and every member thereof in the state, and the defendants, and do award all such claims to be treated as adjusted and concluded between them, except as hereinbefore stated in relation to the contracts for sale of lands, and a matter now in litigation in the state court, between members of the Raper family in reference to their "reservation" money, (which was not considered by the arbitrators).

8. The arbitrators finding that certain title-papers in which the plaintiffs are interested, had not been registered, award that they shall be registered in the proper offices of

the state, and to that end a delivery of the same to one of plaintiffs' agents was awarded. The compensation to Thomas for his services, and the costs of the suits were then passed upon and determined by the arbitrators. The amount of the allowance to them and the manner of its payment, was left to be fixed and provided for by the judge of the circuit court, to which the award was submitted, and became a decree thereof.

In the court below, the defendants' counsel moved to dismiss the action for want of jurisdiction, and as the case turns upon that question, it is not deemed material to set out the issues submitted to and passed upon by the jury. The question of jurisdiction was reserved by the court.

The facts contained in the statement of the case, as tried before Judge Gilmer, are in briefly as follows :

1. Under treaties and laws of the United States, the defendants became entitled to certain moneys, known as "Capitation," "Removal and Subsistence," "Spoliation," "Pre-emption and Reservation," funds, which are retained and invested by the federal government for the benefit of Indians who did not remove west, and paid out by agents appointed by the government.

2. For many years before the late civil war, William H. Thomas was the agent of defendants, and James W. Terrell, disbursing agent of the fund, which amounted to a large sum at the commencement of the war. And when the war closed, the government declined to appropriate any portion of the same to these defendants, upon the ground that they gave their adherence to the Confederate States, many of them serving in the armies thereof.

3. These Indians have an organization or government amongst themselves, and transact their common business by means of " Councils," composed of chiefs and head-men,

selected in various ways to represent their settlements or "towns." One of their own number presides as chairman, and the secretary is assisted by white persons, (selected by them) who record and transmit to the Department at Washington, by messenger or otherwise, such proceedings as relate to their business affairs with the government.

4. In 1868, congress passed an act providing for the enrolment and enumeration of these Indians, and the government was empowered to take supervisory charge of them, as other tribes of Indians, and it has since assumed control over them—appointing agents, establishing schools, and disbursing money to them—reorganized their "council" plan of government—each settlement to be entitled to at least one member—the principal chief, elected for four years, to be the executive officer, but with no power to bind them by contract except by the approval of the Council.

5. It being alleged that Thomas and Terrell had failed to account for moneys received for them in 1870, congress passed an act authorizing them to bring suits in the circuit court of the United States in North Carolina, to recover the same. (These are the suits in which a reference was had to the arbitrators whose report is above set forth.)

6. In March, 1875, the plaintiff in this suit, W. W. Rollins, (and O. F. Presbrey who was made a co-plaintiff) applied to the Interior Department for payment of fees for services performed under the contract sued on, and filed a written and verified statement of the claim amounting to $42,236.77 The application was referred to the board of Indian commissioners, who recommended the payment of $5,200 in full of the demand. This was approved by the Secretary of the Interior, and the amount paid to plaintiffs, but "without prejudice to the parties to claim a balance to be still due to them." A subsequent application for the alleged balance due was refused.

Upon the foregoing facts, His Honor being of opinion

that the court had no jurisdiction of the case, allowed the motion of the defendants' counsel and dismissed the action, and the plaintiffs appealed.

*Messrs. A. S. Merrimon* and *J. H. Merrimon,* for plaintiffs. *Messrs. T. F. Davidson* and *Reade, Busbee & Busbee,* for defendants.

SMITH, C. J.  This action is prosecuted against the remnant of the Cherokee Indians remaining in the south-western counties of the state, after the removal of the great body of the nation under treaty arrangements with the government of the United States, to the reservation provided for them beyond the Mississippi river, for the recovery of compensation for services under contracts entered into on the same day between the plaintiff and John Ross, their Chief, and between him and a large number of their head-men and chiefs, both undertaking to act on behalf and by the authority of the entire body, as a separate and organic community.

The contracts bear date May 15th, 1874, the one entered into by their principal chief, being pursuant to certain resolutions adopted at a general council of the Indians, held on October 9th, 1872; and the other, essentially of the same import in its general provisions, executed by other chiefs and head-men ; and both professing to be obligatory upon the entire tribe.

The contracts were on the same day presented to the judge of the district court of the United States, then holding a term of the circuit court at Asheville, and the execution of each acknowledged by the parties, and so certified by him under the seal of the court with certain other facts stated, as required by the act of congress, hereafter more particularly referred to.

The contracts were with these certificates submitted to,

and bear endorsed, the approval of the Commissioner of Indian Affairs and of the Secretary of the Interior Department at Washington.

Among the claims asserted in the contract, five of which were against the government or its official agencies, to be prosecuted and pressed by the plaintiff, and to which he promises to give diligent attention, the last is thus described: "Sixth. To prosecute and attend to personally, and by such attorney or attorneys as he may employ, and whom he is hereby authorized to employ, all suits now pending in the courts of the United States in behalf of the Eastern Band of Cherokees against any person or persons whatsoever, and such, other suits as it may be necessary hereafter to institute in. any court of the United States or of the state of North Carolina, or of any other state or territory, to establish any right, or redress any wrong or injury done to the undersigned, chiefs or head-men, their tribe or any of their tribe."

The plaintiff stipulates to prosecute the several claims mentioned in the contract, and due from the different sources specified, and the suits on their behalf before these instituted and undetermined, and to receive as his remuneration therefor, the amount of twenty per centum, fixed in the contract with Ross, on whatever funds and the value of whatever property may be by him secured for them from the government or its agents, and from the said, or other suits, as their direct results, or upon any award made by referees or arbitrators, or upon a compromise, but declared in the other contract to be a sum " *not to exceed twenty per centum to be allowed by the Commissioner of Indian Affairs,* out of such amounts as he may collect for, or establish to be due to the Eastern Band of Cherokees on account of any one or all of the claims hereinbefore mentioned, and at the same rate out of the amounts of money or property as may be recovered in the said above suits at law or in equity, now pending or which may be hereafter instituted.

16

The resolutions adopted in the Indian council in 1872, before the suits were brought for the services in which the present demand is made, conferring authority upon John Ross to employ counsel on behalf of the tribe, enumerate their several claims upon the government only, and make no mention of suits to be brought in the courts, while the contract actually made by him with the plaintiff, embraces attention to the suits which had in the meantime been brought, and were then pending. Both contracts were to be in force for four years, and the compensation sought in the present action is limited to the services rendered in the suits only.

The somewhat anomalous condition in which the Indians were placed by reason of the participation of large numbers of them in the military service of the Confederate government during the civil war, and the refusal of the government to pay over the funds due them in consequence, was put an end to by the passage of the act of congress, approved July 27th, 1868, in which the Secretary of the Interior is directed to " cause a new roll or census to be made of the North Carolina or Eastern Cherokees, which shall be the roll upon which payments due said Indians shall be made," and to " cause the Commissioner of Indian Affairs to *take the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians.*" Acts 40 Cong., 2 Sess., ch. 259.

Under this act an enrolment was made and the Interior Department assumed and has exercised such supervisory control over the interests of these Indians, establishing schools, appointing agents and disbursing money to them, and they have organized and put in operation a form of local civil government and public administration, but of course in subordination to the state government.

To enable the Indians to pursue and obtain their funds and the lands which had been purchased with them by pre-

ceding agents, in the act appropriating money for the Indian service for the year ending June 30th, 1871, congress inserted the following clause: "That the Eastern Band of the Cherokee Indians by that name and style be and they are hereby authorized and empowered to institute and carry on a suit or suits in law or equity, in the district or circuit courts of the United States, against the present or former Indian agent or agents of said Band, their administrators, executors and heirs, and against the securities of such agent or agents, their administrators, executors, curators or trustees, for all claims, causes of suit or rights, in law or equity, that said Band may have against them or either of them; and the law of limitations shall apply to such claims, causes of action and rights, from and after the day this act takes effect. It shall be the duty of the District Attorney and the Attorney General of the United States to institute and prosecute all suits, causes for which may arise under this section." Acts 40 Cong., 2 Sess., ch. 296, § 11.

Pursuant to this enactment, which, if it does not confer, recognizes a corporate capacity in the Indians as a collective body or tribe to pursue and recover their property by action in the federal courts, sanctions its institution and provides counsel to prosecute it, suits were instituted on their behalf, one in equity against. W. H. Thomas, William Johnston and James W. Terrell, and the other, at law, against them and two other co-defendants, in the circuit court of the western district of North Carolina, which were depending when the contracts were made with the plaintiff, Rollins, and to his services in conducting them, and the compensation provided therefor, the before recited provisions apply.

These cases and the controversies which gave rise to them were, by written consent of the parties, and the approval of the district judge presiding and holding the court, and that of the Commissioner of Indian Affairs, and the Secretary of the Interior, as well as the department of justice at Wash-

ington, referred to three referees or arbitrators, for a full adjustment, " whose award was to be final and a rule of court."

The referees with great and unwearied care and diligence entered upon and discharged their duties, and made their report, awarding the Indians a large extent of territory, and settling and determining the claims of the parties against each other, and the right and title of individual members of the Band to various tracts under previous contracts with agent. The award was made and became a decree of the court.

Upon the determination of the suits, the plaintiff, Rollins, and his co-plaintiff, Otis F. Presbrey, to whom one moiety of the claim had been assigned, made demand for compensation according to the terms of the contract with the headmen and chiefs, in March, 1875, on the Interior Department accompanying the application with a detailed and verified statement thereof in writing, as directed by section 2104 of the Revised Statutes of the United States, and claiming to be due the sum of $42,236.77. The application was referred to the board of Indian commissioners for examination and report, and they made their report in September following, recommending the payment of $5,200 to the claimants in full of their demand. On the same day the Secretary approved the allowance, adding, " without prejudice to the parties to claim a balance to be still due to them." This sum was paid to the plaintiffs. Subsequently a second application for an additional allowance was preferred before the Commissioner and Secretary and denied by them, and thereupon this action was brought.

In the exercise of the power conferred by the constitution " to regulate commerce with foreign nations, among the several states and with the Indian tribes," congress has by law prescribed in what form and with what solemnities contracts " with any tribe of Indians or individual Indians, not citizens of the United States " must be made, in order

to their validity, Rev. St. U. S. § 2103, to the provisions of which these contracts seem to have been intended to conform ; and the statute declares that " all contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value, paid to any person, by any Indian or tribe, or any one else, for or on his or their behalf on account of such services in excess of the amount approved by the Commissioner and Secretary, for such services, may be recovered by suit in the name of the United States, in any court of the United States, regardless of the amount in controversy."

The next section (2104) forbids the payment to any agent or attorney by an officer of the United States, under any contract, other than the fees due for services rendered thereunder, and proceeds to declare that the moneys due the tribe, Indian or Indians, as the case may be, shall be paid by the United States through its own officers or agent to the party or parties entitled thereto; and no money or thing shall be paid to any person *for services under such contract or agreement* until such person shall have first filed with the commissioner of Indian affairs, a sworn statement showing each particular act of service, under the contract, giving date and fact in detail, and the Secretary of the Interior and Commissioner of Indian Affairs shall determine therefrom, whether in their judgment such contract or agreement has been complied with ; if so, the same may be paid ; and if not it shall be paid in proportion to the services rendered under the contract.

Section 2105 subjects the person receiving money in violation of the provisions of the two preceding sections, and his aiders and abettors, besides the forfeiture, to punishment by imprisonment for not less than six months, and a fine not less than one thousand dollars. The remnant band of Cherokees remaining in the state, by distinct legislative action, have been placed upon the same footing with other

Indian tribes, under the protection and care of the government, and these statutory provisions apply with equal pertinency and force to them as to that portion of the tribe who have emigrated, and been located in their western home.

This seems to have been so understood by the plaintiffs, and is manifest not only in pursuing the prescribed formalities in the initiating the agreement, but in applying to the department for the allowance and payment of the remuneration it provides; and resort is had to the jurisdiction of the state court, only after efforts for an additional sum have proved unavailing and fruitless, there.

. It is obvious that the Indian tribes are in a state of pupilage to the general government, and the safe-guards of law are placed over them to secure them and their property from the artful practices of designing men, the dictate of an enlightened sense of national duty to the weak and defence-less of a race rapidly diminishing in numbers, and deemed incapable of self-protection.

This policy finds expression in the legislation of congress in reference to the tribes and the superintending control assumed over them for their benefit. We do not undertake to say nor intimate the use of any improper influence in bringing about these contracts—for there seems to have been none—nor to under-estimate the advantages derived by the Indians from the energetic and persistent efforts of their agent in the successful prosecution of the suits; but nevertheless, the compensation to be paid must pass under the revision of the national authorities, charged with this imposed duty, as it has passed, and the result is conclusive upon the court.

The present action is in substance an indirect appeal from the twice rendered decision of the department, and after a distinct and final denial of further compensation.

In our opinion, as that was the only tribunal empowered to entertain the application for payment and determine the

amount to be paid, so its decision is exclusive of the interference of a court of the state, and conclusive in effect.

Indeed this is conceded in one of the contracts, which specifies a maximum of compensation—not in excess of twenty per centum—leaving the amount " to be allowed by the Commissioner of Indian Affairs out of such amounts as he (the agent) may collect," and applying the same rule and rate to the value of property acquired by the suits, arbitration or compromise. The sum has been fixed by the Commissioner, sanctioned by the head of the department and paid, and however inadequate it may appear to us, as a remuneration, it is beyond the jurisdiction of the superior court to revise and modify, or to make addition in amount.

Again, the allowance was intended to be, and so it is declared in the report of the board to the Secretary, in satisfaction of the whole claim, and it is not the less so, because the latter left the claimants free to assert, as they afterwards did unsuccessfully assert, a right to an additional allowance upon the same offices, and thus the adjudication became and was unconditional and final.

Strongly corroborating these views is the provision in the enactment authorizing the suits which imposes upon the District Attorney and Attorney-General the duty of bringing and prosecuting the proposed suits in their official capacity ; and as the necessity of employing further professional aid is left with the public authorities, so must be the duty imposed of passing upon the extent and value of the services and their just measure of remuneration.

Indeed it is a question not wholly free from doubt, whether, as the professional services of the District Attorney and Attorney-General are expressly given to the Indians in the authorized suits, any additional professional services under contract or otherwise, could under the law be recognized and allowed by the Commissioner out of the moneys due the Indians. But it is not our province to decide the point,

and it is referred to only to sustain our conclusion that to no other source can the plaintiff look for compensation.

Some embarrassment would be met if there were jurisdiction in enforcing in one action two contracts so variant in the provision for compensation to the same attorney and agent, and for the same services in the one case, determinate, and in the other, dependent upon the action of another party, both of which contracts have been sanctioned according to the findings of the jury, by the Eastern Band, as a collective and tribal body. But the jurisdictional difficulty met *in limine* precludes any inquiry as to the effect of the contracts in this respect.

Nor have we considered the defence under our own statute (Bat. Rev. ch. 50 §9) which avoids all contracts made since May 18th, 1838, for an amount equal to ten or more dollars, with any "Cherokee Indian or any person of Cherokee Indian blood within the second degree," unless it be in writing and signed in the presence of two attesting witnesses. If this act be not obnoxious to the imputation of discriminating between this and other classes of citizens, under the prohibition of the recent changes in the constitution of the United States, it is inapplicable to the present case, if not for the reason that it deals with individual Indians rather than with the tribes, in their political and corporate relations, because of the superseding and annulling effect of the legislation of congress covering the same matter.

It is quite obvious then that the general government having assumed the guardianship and oversight of the various Indian tribes, and prescribed rules and regulations for their guidance and protection, their contracts cannot be enforced against them in the state courts, without the consent of this parental authority, and redress must be sought for violated agreements in a different jurisdiction.

The question of jurisdiction was reserved and the trial allowed to proceed before the jury, but whether reserved or

not, if the defect or want of jurisdiction appears, even after verdict, the action should be dismissed, since the results of a trial *coram non judice,* are absolutely null.

We therefore sustain the ruling of His Honor in dismissing the action upon the facts found by the jury and contained in the statement accompanying the record, for the reasons we have already given, and in leaving the plaintiffs to seek elsewhere the relief, if any, to which they may be entitled.

No error.	Affirmed.