UNITED STATES et al. v. BOYD et al.

(Circuit Court, W. D. North Carolina. June 17, 1895.)

CHEROKEE INDIANS—CITIZENSHIP.
> The Indians belonging to the Eastern Band of Cherokees in the state of North Carolina have never become citizens of the United States, and the federal courts have jurisdiction to entertain a suit brought by the United States, as guardian of such Indians, for the protection of their interests.

This was a suit brought in the name of the United States, and of Sampson Owl and others, Cherokee Indians, against D. T. Boyd and others, to set aside a contract made by the Indian council. Defendants moved to dismiss the bill for want of jurisdiction.

R. B. Glenn, U. S. Atty., and D. A. Covington, Asst. U. S. Atty.

H. G. Ewart, Geo. H. Smathers, W. T. Crawford, J. M. Moody, and Louis M. Bourne, for defendants.

SIMONTON, Circuit Judge. This is a bill filed in the name of the United States of America, and of Sampson Owl and others, Cherokee Indians, suing in their own behalf, etc., against these defendants. The bill, asserting the paramount authority and guardianship of the United States over the Eastern Band of Cherokee Indians, seeks to set aside a contract made by their council, a majority thereof making it, with certain of the defendants, for the sale of timber on the lands owned and occupied by the Cherokees in North Carolina. At the threshold of the case the question is raised as to the jurisdiction of this court, and that question depends upon the relation which the United States bears to these Cherokee Indians. Are they under the guardianship of the United States as tribal Indians are, or are they citizens of the United States, with all the rights, powers, duties, and obligations of citizens? The decision of this question is necessary before discussing any other questions in the cause.

The Cherokee Indians, a powerful and warlike Nation, inhabited the country bounded by the Atlantic Ocean. Pressed back by settlements of white men on the coast, they had established themselves in the mountain regions of Georgia, North Carolina, Alabama, and Tennessee, and were a fruitful source of danger, anxiety, and discontent to the citizens of the United States living in their neighborhood. For many years, the government made strenuous efforts to induce them to leave these settlements, and to immigrate to lands allotted to them to the west of the Mississippi, with partial success only. Finally, by treaty concluded 29th December, 1835, at New Echota, in the state of Georgia, between the United States and the Cherokee Nation, they, as a Nation, consented to go west; and the large majority of them did so. Some of them, however, preferred to remain. Of these, some ——— families settled in the state of North Carolina, and claimed for themselves their due portion of all the personal benefits accruing under the treaty for their claims, improvements, and per capita. Utilizing these claims, they sent an agent to Washington, who obtained the money provided for them, and in-

vested it in lands in the state of North Carolina, some ――――― acres in extent, upon which these families of Cherokees settled. They are known as the "Eastern Band of Cherokee Indians." Their agent and attorney, W. H. Thomas, purchasing these lands, took title to them in his own name. As serious complications grew out of this fact between the Indians and the creditors of Thomas and some other parties occupying said lands or asserting outstanding claims upon them, the congress of the United States, by a provision in the act of July 15, 1870, made it the duty of the district attorney and the attorney general of the United States to institute and prosecute a suit or suits in law or equity in the district or circuit courts of the United States for the purpose of ascertaining the rights of the parties, and fully adjusting all matters of controversy. Such a suit was instituted 20 years ago, and the matters involved were, by consent of parties, referred to three arbitrators, "whose award was to be final and a rule of court." After careful and patient investigation and consideration, an award was made, which was fully approved and confirmed by a decree of this court. Many years afterwards a suit in equity was instituted in this court by the attorney general of the United States, in the name of the United States, for the purpose of having fully enforced the terms of the aforesaid award and decree. The progress of this suit was obstructed and greatly delayed by many serious and perplexing difficulties, until the congress of the United States appropriated a large sum of money, sufficient to carry out the terms of compromise agreed upon by the litigant parties, to pay off all liens in the hands of judgment creditors of W. H. Thomas, to settle questions of boundary, and to extinguish all other claims to said lands, so as to give the Indians a good, clear, and definitely located title. By a decretal order of this court, the standing master in chancery was directed to prepare and have duly executed a new deed conveying said lands in fee simple, omitting a clause in the former deed imposing restrictions upon the power of alienation, which had been inserted by the draftsman, without authority of any order or decree of this court. The contract complained of relates to standing timber on these lands.

Are these Cherokee Indians citizens of the United States? They or their fathers were members of the tribe of Cherokee Indians recognized by the government as a Nation. Eastern Band of Cherokee Indians v. U, S., 117 U. S. 288, 6 Sup. Ct. 718. By the treaty of New Echota, individuals and families who were averse to removal with the Nation were suffered to remain in the states in which they were living, if they were qualified to take care of themselves and their property, and were desirous of becoming citizens of the United States. Those who exercised this privilege terminated their connection with the Cherokee Nation. Id. Did this make them citizens of the United States? "The alien and dependent condition of the members of the Indian tribes could not be put off at their own will without the action or assent of the United States. They were never deemed citizens of the United States, except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the re-

moval of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens on application to an United States court for naturalization, and satisfactory proof of fitness for civilized life." Elk v. Wilkins, 112 U. S. 100, 5 Sup. Ct. 41. There is nothing in the record going to show that these Indians were ever naturalized. Have they been made citizens by treaty? The clause in the treaty relating to those Cherokees who preferred to remain behind the Nation is in these words:

"Art. 12. * * * Such heads of Cherokee families as are desirous to reside within the states of North Carolina, Tennessee, and Alabama, subject to the laws of the same, and who are qualified or calculated to become useful citizens, shall be entitled to a prescriptive right to certain lands."

This does not confer on them citizenship. It only authorizes them to become citizens when it is recognized that they are qualified or calculated to become useful citizens. This presupposes some sort of examination into the question of their qualification, and a favorable decision therein. If the words of the treaty do not make them citizens of the United States, and only gives them the right to become citizens upon showing the desire to that end, then there was but one way for them to attain citizenship, and that is pointed out in the statutes relating to naturalization.

But it is urged with great force that the state of North Carolina recognizes these Cherokees as citizens; that they vote, pay taxes, work roads, and perform all the duties of citizens. But a citizen of the United States takes this privilege as the gift of the general government. It can be acquired only under its laws, and in the mode prescribed by it. City of Minneapolis v. Reum, 56 Fed. 576, 6 C. C. A. 31. "Neither the constitution of a state nor any act of its legislature, however formal or solemn, whatever rights it may confer on these Indians or withhold from them, can withdraw them from the influence of an act of congress which that body has the constitutional right to pass concerning them. Any other doctrine would make the legislature of the state the supreme law of the land, instead of the constitution of the United States and the laws and treaties made in pursuance thereof." U. S. v. Holliday, 3 Wall., at page 419. But it must not be understood that these Cherokee Indians, although not citizens of the United States, and still under pupilage, are independent of the state of North Carolina. They live within her territory. They hold lands under her sovereignty, under her tenure. They are in daily contact with her people. They are not a nation nor a tribe. They can enjoy privileges she may grant. They are subject to her criminal laws. None of the laws applicable to Indian reservations apply to them. All that is decided is that the government of the United States has not yet ceased its guardian care over them, nor released them from pupilage. The federal courts can, still, in the name of the United States, adjudicate their rights. Nor is this without precedent. The American seaman, born a citizen of the United States, or naturalized as such, has extended over him the guardian care of the government, and is a ward of the nation. The statute books abound with acts requiring his contracts to be looked into by officers appointed for that

purpose, and every precaution is taken to guard him against fraud, oppression, and wrong. Rev. St. U. S. § 4554 et seq.

It is contended that the view taken of this pupillary condition of these Cherokee Indians violates the provisions of the constitution and laws of North Carolina, forbidding perpetuities. A perpetuity is the attempt to forbid the alienation of lands under any circumstances, and to provide for their descent or disposition in a fixed, unchangeable way. But the Indians hold these lands to no such purpose. Their realty can be alienated, but the contract is reviewable by the government for one purpose only,—to protect them from fraud or wrong. A condition attached to alienation does not create a perpetuity. A conveyance or devise to A., in trust for a feme covert in fee, with power of sale upon her written request, or subject to her approval, does not create a perpetuity.

There is another consideration. In determining the attitude of the government towards the Indians,—all Indians,—the courts follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. U. S. v. Holliday, supra. Now, congress has repeatedly recognized the distinctive character of these Cherokees as a body,— the Eastern Band Cherokee Indians. It has legislated for their benefit, and has always treated this band as a distinct unit. They are not dealt with as individuals, who gradually are absorbed into the body of the community, but as a band isolated from, cared for apart from, other inhabitants. See 9 Stat. c. 118; 10 Stat. 291, 700; 16 Stat. 362; 18 Stat. 213; 19 Stat. 176; 22 Stat. 302; 27 Stat. 120.

In July, 1868, congress transferred the care of the Indians from the treasury department to that of the interior; and section 3 of this act expressly includes the Eastern or North Carolina Cherokees. The original condition of all the Indians in this country was that of pupilage under the government (Cherokee Nation v. Georgia, 5 Pet. 3); its pupilage continuing until released by the government. The statutes quoted show that it has never been released. The supreme court of North Carolina, in Rollins v. Cherokees, 87 N. C. 229, distinctly recognizes and clearly and forcibly sustains the position taken above. The Case of the Cherokee Trust Funds, 117 U. S. 288, 6 Sup. Ct. 718, does not conflict with these views. That case decides that this Eastern Band of Cherokee Indians is not a part of the Nation of Cherokees with which this government treats, and that they have no recognized separate political existence; but, at the same time, their distinct unity is recognized, and the fostering care of the government over them as such distinct unit. This being so, the United States have the right in their own courts to bring such suits as may be necessary to protect these Indians.

The motion to dismiss the bill on this ground is disallowed. The injunction heretofore granted is continued until the further order of this court.

DICK, District Judge (concurring). The rights of the Eastern Band of Cherokee Indians in and to their lands purchased by their agents with their money obtained from the United States, and their

civil relations with the state and national governments, have been subjects of frequent discussions and litigation in the local and federal courts of this district for more than 20 years.   Suits in various forms have been instituted in the federal courts,—in their tribal name as the "Eastern Band of Cherokee Indians," and in the name of the United States for their benefit.   These suits gave rise to many difficult and perplexing questions of law and fact, and I sincerely hoped that all these matters of controversy had been finally adjudicated and adjusted by a decree of this court at October term, 1894, carrying into effect a compromise agreed upon by the departments at Washington,—the Indian council and the parties defendant,—and reserving the case on further directions to adjust some matters of detail.   I was disappointed in this cherished hope when the suit now before us was instituted, presenting other matters of controversy.   At my special request, Judge SIMONTON attended the circuit court at May term in Asheville for the purpose of hearing some preliminary questions in this case.   We heard full and able argument of counsel upon a motion of defendants to dismiss for the want of jurisdiction, and, upon full conference, we reserved the question presented for further consideration.   We regarded the question as one of great importance, for, if the court has not jurisdiction in this case, then it did not have jurisdiction in previous similar cases, and many orders and decrees heretofore made are void.

The preliminary question presented for our determination is whether the United States have such supervisory authority and power over the North Carolina Cherokees as to become a party plaintiff in a suit in equity in this court, instituted under the direction of the executive departments of the government, for the purpose of annulling or modifying a contract made by the council of such Indians in relation to their lands purchased by their agent with the per capita money and removal and subsistence money to which they were entitled under the treaty of New Echota, upon the alleged grounds that such contract was induced and procured by means of circumventive, undue influence and fraud, or that the contract was grossly injudicious and unconscionable, and without the approval of the secretary of the interior, having supervisory charge of these Indians under an act of congress.   In the suit before us the United States do not claim any right that encroaches upon any of the sovereign powers, duties, and obligations of this state.   They claim no police power over the Indians as citizens of the United States, or right to punish for crime committed within the territorial limits of this state.   They only insist upon the right to appear as a plaintiff in a suit in equity instituted in their circuit court to invoke the jurisdiction of such court in behalf of their wards,—to obtain such relief as may be granted upon the well-recognized principles of equity jurisprudence.   They appear as sovereign of this dependent Indian community, as parens patriae of this helpless and injured race, not yet invested with the full rights of American citizenship, and as guardian, by treaty obligations, of these ignorant and injudicious wards, to control their transactions about lands acquired by the

treaty money, and the charitable trust funds bestowed by congress upon a political department of the government to be applied for the benefit of these Indian cestuis que trustent.

The United States claim that, under their constitutional power to regulate commerce with Indian tribes, the word "commerce" embraces trade and traffic, and all contracts with the tribes or individuals composing such tribes; that, so long as Indians remain a distinct people, with an existing tribal or quasi tribal organization, recognized by the political departments of the government, congress has the power to say with whom and on what terms they shall deal, and can place them under the supervisory control of an executive department. U. S. v. Holliday, 3 Wall. 407; The Kansas Indians, 5 Wall. 737; U. S. v. 43 Gallons of Whiskey, 93 U. S. 188. It is further insisted by the district attorney that by the act of July 27, 1868, congress authorized and directed the secretary of the interior and the commissioner of Indian affairs to take the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians; and there is a necessary implication of power that if, in the exercise of such supervisory charge, it becomes necessary to resort to a court of equity for remedy and relief, a suit may be properly instituted by such supervisory department in the name of the United States to obtain adequate redress. He cites as a precedent a suit in equity in this court, now pending on further directions, in which the bill was filed by Attorney General Garland, in the name of the United States as plaintiff, for the purpose of enforcing an award made by arbitrators appointed under a decretal order of this court in relation to the rights and title of the North Carolina Cherokees to the lands embraced within the Quallá Boundary,—the lands which are the subject of controversy in the present suit. I am of opinion that, wherever a power is conferred and a duty imposed by statute, everything necessary to accomplish the legislative purpose is given by implication. "A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter." U. S. v. Freeman, 3 How. 556–565.

The suit in equity now before us was instituted by the district attorney under the direction of the secretary of the interior and the attorney general, for the purpose of seeking investigation as to the fairness, justice, and expediency of a contract made by the Indian council disposing of timber on the Indian lands in this state without the approval of the secretary of the interior. It seems to me that the only question for the court now to determine is whether the political departments of the government have clearly and distinctly recognized the North Carolina Indians as a tribal organization under the supervisory care and guardianship of the United States, for the court must be governed upon such subject by the action of such departments. I have read with some care the case of the Cherokee Trust Funds, 117 U. S. 288, 6 Sup. Ct. 718, cited and relied upon by counsel for defendants. That case gives an interesting and instructive history of the dealings of the United States

with the Cherokee Indians, but only decides that the North Carolina Cherokees had dissolved their connection with the Cherokee Nation, and were not entitled, while they remain residents and citizens of North Carolina, to a proportionate share of the funds held in trust by the United States for the benefit of the Cherokee Nation. It is true that the North Carolina Cherokees are citizens of this state, and have not been recognized as a separate nation or tribe, with treaty-making power; but it seems to me that the mere fact that they are citizens of this state does not necessarily deprive them of the legitimate guardianship and care of the United States where there is no state or national legislation indicating such a purpose. Their forefathers availed themselves of a provision in the treaty of New Echota, and remained in the state of North Carolina; and the civil laws of the state were extended over them from the period of the removal of the Cherokee Nation to their territory west of the Mississippi river. The North Carolina Cherokees, by reason of their birth and residence, became citizens under the general provisions of the state constitution, and not by any special law conferring the rights of citizenship. The policy of state legislation seems to have recognized their quasi tribal organization, and regarded them as a peculiar class of citizens, worthy of and needing the kindly supervision and care of the state and national governments. For the purpose of securing them against the evil consequences of injudicious contracts with more intelligent and designing white men, a state statute was enacted requiring all contracts, equal to $10 or more, with Cherokee Indians, to be in writing, signed in the presence of two witnesses, who shall subscribe the same. 1 Code N. C. § 1553. This law of the state imposed upon them a restriction which was not imposed upon other citizens, except as to transactions coming within the statute of frauds and a few other cases. On the 2d day of January, 1847, "An act in favor of the Cherokee Chief Junaluska" was duly enacted and ratified by the legislature of this state, conferring upon him all the rights of citizenship, and directing the secretary of state to issue a grant conveying to him in fee simple a valuable tract of land in Cherokee county, without the power of alienation by deed; and it was held in this court that such restriction upon the power of alienation was not inconsistent with the rights of citizenship. Smythe v. Henry, 41 Fed. 705. See, also, Eells v. Ross, 64 Fed. 417, 12 C. C. A. 205. The political departments of the federal government have certainly recognized and treated the Eastern Band of Cherokees as a quasi tribal organization for social and business purposes, and have made liberal appropriations of money, appointed Indian agents to reside among them, and employed efficient means to enlighten their minds, increase their comforts, and guard them against the injurious consequences of their own ignorance and indiscretion, and the frauds, aggressions, and wrongs of unscrupulous white men. The act of congress of July 27, 1868, in express terms placed them in the same situation towards the government as other tribes of Indians. I am strongly inclined to the opinion that the act of congress restored

them to their former tribal relations as wards of the United States, subject to their control, and entitled to their care and protection. The relations of the United States to all Indian tribes are now regulated by acts of congress, and not, as formerly, by treaties. U. S. v. Kagama, 118 U. S. 375–382, 6 Sup. Ct. 1109.

By numerous acts of congress, the legislative department of the government has recognized the Eastern Band of Cherokee Indians residing in North Carolina as being under the supervisory care of the United States. I will cite only a few of these acts. The act of July 15, 1870, authorized and directed the attorney general to institute and prosecute a suit in equity in this court in the name of the Eastern Band of Cherokees for the purpose of securing to them the lands purchased with their treaty money by their agent, W. H. Thomas. At several times acts were passed by congress making liberal appropriations of money for the purpose of carrying on that suit and other subsequent suits in the name of the United States in relation to such lands. In the Cherokee Trust Funds Case, 117 U. S. 288, 6 Sup. Ct. 718, "the suit by petitioners was authorized by an act of congress, and it was brought against the United States and the Cherokee Nation." By act of congress approved August 4, 1892, provision was made for the annual payment of the taxes on the lands of the Eastern Band of Cherokee Indians in North Carolina, and all orders or provisions for the sale of timber on said lands to pay the accrued taxes and incumbrances on the same were revoked. On the ——— day of ———, 189–, congress made an appropriation of a large sum of money for the purpose of effectuating a compromise made by the political department of the government with certain persons claiming lands, adverse to the Indians, within the uncertain, unsettled, and extensive Qualla Boundary, which had long been a subject of vexatious and expensive litigation. The supreme court of North Carolina, in Rollins v. Cherokees, 87 N. C. 229, fully recognized the power and right of the United States to supervise and control the affairs, lands, and contracts of the North Carolina Cherokees. The court refers with approbation to the acts of congress regulating contracts with Indians, and expresses the opinion that such laws apply to contracts made with the North Carolina Indians. From the kind and liberal policy manifested by all the departments of the state government, I am satisfied that North Carolina is not jealous of state rights, or apprehensive that difficulties and conflicts of jurisdiction may arise from an imperium in imperio, controlling to some extent the affairs of her Indian citizens.

I understood the counsel of defendants in their argument to insist, in substance, that the Eastern Band of Cherokees in North Carolina is a corporation duly organized under the laws of this state, and holds its lands in fee simple under a deed executed by the standing master in chancery, under a decree of this court made at October term, 1894; that such deed contains no restriction upon the power of alienation; and that the Indian council, as representatives of the corporation, had full power to make the timber contract involved in this suit. The counsel further show that at the fall term of this court, in 1894, a decree was made directing a deed to be

executed in accordance with an award of arbitrators filed at said term; that some time thereafter a deed was prepared and executed containing a clause restricting the power of alienation which was not in accordance with the said award and decree, was repugnant to the nature of the estate conveyed, and in disregard of article 1, § 31, of the state constitution, in relation to perpetuities; that the decree of October term, 1894, was made upon a supplemental bill in equity, filed by the district attorney under the direction of the secretary of the interior and the attorney general, for the express purpose of having a new deed in fee simple executed by the standing master in chancery, omitting the repugnant clause restricting the power of alienation; that, by such proceeding in this court, the United States fully recognized the right and power of the Eastern Band of Cherokees to make free alienation of their lands, and surrendered or waived control of them as to the timber contract involved in this suit. I am of opinion that the only purpose of the departments in the legal proceedings referred to was to have a deed executed which was in conformity with the award of the arbitrators, the decree of the court, and the laws of the state regulating the conveyance of lands within its limits. These matters relate to the merits involved in this case, and not to the in limine question of jurisdiction now before the court. Judge SIMONTON has expressed some views upon these questions in which I fully concur. I will say, further, that I am strongly inclined to the opinion that the action of the secretary of the interior, the attorney general, and district attorney in procuring, by procedure in this court, execution of the new deed under which the Eastern Band of Cherokees now hold their lands in fee simple as a corporation, neither expressly nor by implication relieved the United States from any obligation of duty imposed, or waived any power conferred by the constitution, treaties, or acts of congress. Eells v. Ross, supra. I am satisfied that the court has jurisdiction of this case. If I had any doubt as to jurisdiction, I would, in a court of equity, be disposed to regard with favor the maxim "boni judicis est ampliare jurisdictionem," to accomplish the ends of substantial justice and fair dealing. Courts of chancery in this country and England have, by a wise and salutary development of the principles of natural justice, built up an extensive, enlightened, and beneficent jurisdiction in equity for the purpose of redressing wrongs, securing rights, and affording remedies adequate to the requirements of justice.

I concur in the order of the circuit judge disallowing the motion, and continuing the injunction heretofore granted until the further order of this court.