ADAMS et al. v. MURPHY.

(Circuit Court of Appeals, Eighth Circuit. November 7, 1908.)

No. 2,743.

1. INDIANS (§ 24*)—ATTORNEY FOR INDIAN NATION.

An act of the National Council of the Creek Nation authorizing the principal chief "to contract with, retain and employ an attorney at law, or firm of attorneys at law," to represent the nation and its members, and providing that the contract should be subject to cancellation on 30 days' notice for good cause shown, did not make the attorney contracted with thereunder an officer of the nation, but he was a professional employé only, deriving his rights from the contract and not from the statute.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 24.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. EQUITY (§ 46*)—GROUNDS OF JURISDICTION—LACK OF ADEQUATE REMEDY AT LAW.

The rule that the nonexistence of a plain, speedy, and adequate remedy at law is a ground for equity jurisdiction does not apply where the denial of a legal remedy is from considerations of public policy.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 151–163; Dec. Dig. § 46.*]

3. SPECIFIC PERFORMANCE (§ 73*) — CONTRACTS ENFORCEABLE — CONTRACTS OF EMPLOYMENT.

A suit in equity will not lie for the specific performance of a contract for personal services.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 206–210; Dec. Dig. § 73.*

Of contracts requiring performance of continuous acts, see note to 49 C. C. A. 103.]

4. INDIANS (§ 27*)—STATUS OF TRIBES—ACTIONS.

The Curtis act of June 28, 1898, c. 517, § 2, 30 Stat. 495, providing that when in any suit in the courts of the Indian Territory it should appear that the property of any tribe would be affected such tribe should be brought in as a party, applied only to suits relating to membership in the tribes and the right to tribal lands or funds, and did not have the effect of abolishing the general exemption of the tribes from civil suits.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 19; Dec. Dig. § 27.*]

5. INDIANS (§ 27*)—SUIT TO ENFORCE CONTRACT OF NATION—JURISDICTION.

The Creek Nation of Indians being exempt, from considerations of public policy, from civil suit to compel its performance of a contract or to recover damages for its violation, the purpose of such a suit cannot be indirectly accomplished by means of a suit in equity against the principal chief of the nation to compel him in his official capacity to pay money of the nation into court to be applied to the discharge of a contract made in its behalf.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 19; Dec. Dig. § 27.*]

Appeal from the United States Court of Appeals in the Indian Territory.

For opinion below, see 104 S. W. 658.

This is a suit in equity brought by A. P. Murphy, appellee here, against P. Porter, as principal chief of the Creek Nation, and M. L. Mott. Pending the appeal P. Porter died, and the case was revived and continued in the name of John Adams, as administrator of his estate. The bill alleges that on the 10th day of January, 1903, the defendant P. Porter, as principal chief of the Muskogee or Creek Nation, entered into a contract in writing with complainant, employing him as national attorney for the tribe to represent it before the departments in Washington and the Dawes Commission, and in any litigation growing out of such questions as the right to membership in the tribe, and the right to tribal lands. The employment was to continue until the tribal relations of the Muskogee Nation had been dissolved, and until March 1, 1906. The salary was fixed at $5,000 per annum, in addition to expenses, payable quarterly. The complainant also signed the contract on his part and accepted its terms, and agreed to perform the services therein mentioned. The instrument contained a provision that it should be "subject to cancellation by either party hereto upon thirty days' notice for good cause shown." This contract was entered into pursuant to an act duly passed and approved by the National Council of the Muskogee Nation, authorizing their principal chief "to contract with, retain and employ an attorney at law, or firm of attorneys at law," and setting forth specifically the duties of the employment, and providing that the contract should be subject to cancellation as above mentioned. The contract was approved by the Secretary of the Interior in accordance with the provision of the statute. Immediately upon the execution of this contract the complainant entered upon the performance of his duties thereunder, and con-

tinued to act as national attorney until March 23, 1904. A short time previous to that date, Charles J. Bonaparte and Clinton R. Woodruff, as special inspectors, had reported to the federal government at Washington that Mr. Murphy had filed charges against a Mr. Douglas, engaged in the Indian service in the Indian Territory, which were either altogther unfounded, or very greatly exaggerated, and in so far as they had a basis of facts arose from friction between Mr. Murphy and Mr. Douglas. This report further stated as follows: "We feel that our duty would not be fully discharged if we did not add to what is said of Mr. Murphy in our original report, that he is, in our judgment, so much influenced in his recollection of events and his opinion of individuals by his very strong sentiments of personal sympathy or antipathy as to render his statements untrustworthy and to impair his usefulness as a public officer." This report was brought to the notice of the various departments before whom the complainant was by the terms of his employment to represent the Creek Nation, and the principal chief, acting in good faith, and believing that his usefulness to serve the nation was thereby impaired, if not destroyed, notified complainant in writing, on the 23d day of March, 1904, that his employment was terminated, saving unto him, however, by the notice, the right to his salary for 30 days. In this notice the principal chief assigned as his reason for the termination of the appointment the above-mentioned report. Immediately upon receipt of this notice the complainant served a counter notice denying that there was just cause for his discharge, and denying the authority of the principal chief to terminate the contract. About 30 days later the principal chief, acting on behalf of his nation, entered into a contract with the defendant. M. L. Mott, similar in its provisions to the one which had existed with the complainant. The bill further avers that the action of the principal chief in terminating the contract was unjust, oppressive, and in violation of the trust conferred upon him by the Creek National Council, and that complainant was ready, willing, and able to continue in faithful performance of the contract on his part, and was entitled to the compensation provided therein; that the Creek Nation had in its annual appropriation bill for the current year appropriated the sum of $5,000 for the payment of the salary of national attorney, and that the principal chief intended to pay over this money from time to time to the defendant Mott, in violation of the rights of the complainant. The bill further alleged as the basis for equitable relief: "That this plaintiff has no remedy at law by which he could sue the Creek Nation and recover from said Creek Nation the amount of unpaid salary due him under and by virtue of the contract of January 10, 1903, or for damages for the breach of said contract, and that if the defendant P. Porter does issue to the said M. L. Mott the warrant or warrants for the salary of Creek national attorney, arising and accruing subsequent to April 1, 1904, and the said M. L. Mott receives the same, this plaintiff will be without any adequate remedy at law to recover the balance of his salary as Creek national attorney for the year 1904, and without any remedy at law whatever to recover the same." The bill asks that the defendant Porter be enjoined and restrained from signing or issuing any warrant or warrants upon the general fund of the Creek Nation, payable to Mott, or to any other person except to the plaintiff, for the salary of Creek national attorney, and enjoining and restraining the defendant Porter from paying to the defendant Mott, or any other person than the plaintiff, any portion of the salary of Creek national attorney, and enjoining and restraining the defendant Mott from receiving or attempting to receive, either directly or indirectly, such salary, or any warrant therefor; and as permanent relief, in addition to an injunction in substantially the terms above mentioned, the bill asked that the complainant, A. P. Murphy, be adjudged to be the duly and legally constituted national attorney for the Creek Nation, entitled to perform the duties of such, and to receive the pay for the same. Upon this bill an application was made for a temporary injunction in accordance with the prayer, which was granted.

Thereafter, on application of the complainant, the injunction was so modified as to command the defendant P. Porter to execute and file with the clerk of court warrants upon the general fund of the nation for the salary of national attorney, payable to the order of the complainant, and requiring the complainant to indorse the same, and directing the clerk to collect the

proceeds thereof and hold the same in the registry of the court subject to its final decree. Thereafter, by stipulation of the parties, and manifestly simply for the convenience of getting the fund into the custody of the court without the necessity of the warrants being made payable to the complainant and indorsed by him, the injunction was further modified so as to command the defendant P. Porter to execute the warrants for the salary of national attorney payable to the clerk of court directly, and requiring him to collect the same and hold the proceeds subject to the final decree in the cause.

A demurrer was interposed to the bill on behalf of the defendants, charging (1) that the complaint did not state facts sufficient to constitute a cause of action; (2) that it showed upon its face that the plaintiff had a complete remedy at law; (3) that the facts set forth in the complaint were not sufficient in law to give a court of equity jurisdiction or to warrant the granting of an injunction or restraining order. This demurrer was overruled, and an exception saved. The briefs upon the argument of the demurrer are set forth in the record, and it appears therein that it was contended that the court had no jurisdiction of an action against the Creek Nation or its principal officers, the case of Thebo v. Choctaw Tribe of Indians, 66 Fed. 372, 13 C. C. A. 519, being cited as authority. To the application for modification of the injunction so as to require the defendant P. Porter to execute warrants and file the same with the clerk of court, a further demurrer was interposed, challenging the jurisdiction of the court, and specifying particularly "that the court has no jurisdiction to order the defendant P. Porter, as principal chief of the Creek Nation, to issue the warrants on the treasury or funds of the Creek Nation, or to order said warrants to be paid"; and further alleging that the suit relates to and involves property of the Creek Nation, and said nation not having been made a party to this suit, as required by law, the court is without jurisdiction to make the order prayed for in the motion. As already stated, this demurrer was also overruled, and complainant's motion was granted. Thereafter an answer was interposed to the bill, admitting many of its provisions, but charging that the complainant had so misconducted himself as to forfeit the confidence of the departments before whom he was to represent the nation, and thus giving to the principal chief just cause for terminating the contract. The cause was referred to a master, who took testimony therein, and reported his findings of fact and conclusions of law. In this report the master found that no good cause existed for the termination of the contract, and that the plaintiff was entitled to his salary down to March 4, 1905, when he became a member of Congress from the Sixteenth district of Missouri, and disabled from performing his duties under the contract. In his conclusions of law the master finds: "That the employer has a legal right to dismiss or discharge the employé, and that P. Porter, as principal chief of the Creek Nation, had the right to dismiss and discharge the plaintiff, A. P. Murphy, as its attorney, but, unless good cause was shown, the nation is liable for the damages for the violation of its contract." The report recommended that a decree be entered adjudging that the complainant, A. P. Murphy, is entitled to recover the salary due as national attorney of the Creek Nation, under his contract, from the 1st day of April, 1904, to the 4th day of March, 1905, at the rate of $5,000 per annum, and that the same be ordered paid out of the moneys paid into court. Numerous exceptions were saved to this report of the master, but they were all overruled by the final decree of the court, and the report was approved and confirmed. It was therein also adjudged and decreed that the plaintiff, A. P. Murphy, do have and recover of and from the defendants, P. Porter and M. L. Mott, to be paid out of the funds in the hands of the clerk of court, the sum of $4,320.08, and the clerk was ordered and directed to pay over to the said plaintiff, A. P. Murphy, out of the funds in his hands, the sum of $4,320.08, and that the plaintiff, A. P. Murphy, have and recover of and from the defendants, P. Porter and M. L. Mott, all of his costs in this action, paid out or expended.

An appeal was taken from this decree to the United States Court of Appeals for the Indian Territory, where the decree was affirmed, and the appeal to this court is brought to review that action.

John R. Thomas (Grant Foreman, on the brief), for appellants.

William T. Hutchings and Preston C. West, for appellee.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge (after stating the facts as above). Much of the argument in this cause has been devoted to the question whether Mr. Murphy was an officer of the Creek Nation, or simply held a professional employment. It seems to us that both the statute and contract leave little room for doubt on this point. The statute authorizes the principal chief "to contract with, retain and employ an attorney at law or firm of attorneys at law." This is wholly incompatible with the idea of office. A firm of attorneys could not hold an office. The statute also provides that the contract shall be subject to cancellation. If it had contemplated the employment as giving rise to an office, it would have made provision for the removal of the occupant from office. The statute simply conferred authority upon the principal chief to make the contract. It did not direct him to appoint an officer, and the person whom he employed derived his rights from the contract and not from the statute. This case is much stronger upon its facts than the case of Hall v. Wisconsin, 103 U. S. 5, 26 L. Ed. 302, in which a similar question was presented, and the Supreme Court held that the relationship was one of contract and not of office.

Being a mere contract for professional employment, the ordinary action at law for damages constitutes a full and complete remedy for its violation. But the Creek Nation is exempt from civil suit to compel performance of its contracts or to recover damages for their violation. Neither can the courts by judicial constraint require the chief officer of that nation to do those acts which if done by him voluntarily would constitute performance of the contract by the nation. Such political societies, like private corporations, can act only through agents, and to constrain those agents is to constrain the society. To say that this tribe is exempt from civil suit on its contracts, and yet compel its principal chief, by judicial process, to take funds from its treasury and turn them over to the court to be applied in discharge of its contracts, is to destroy in practice the very exemption which at the outset is conceded as a legal right.

This court had before it in the case of Thebo v. Choctaw Tribe of Indians, 66 Fed. 372, 13 C. C. A. 519, an action involving the same fundamental rights as are presented by the present appeal. That suit was brought to recover on a contract for payment of attorney's fees, but the court held upon a full review of the authorities, and examination of the nation's course of dealing with Indian tribes, that the United States Court in Indian Territory had no jurisdiction of an action against the Choctaw Nation, or the chief executive officers thereof, when sued in their capacity as such for an alleged debt or liability of the nation. Upon considerations of public policy such Indian tribes are exempt from civil suit. That has been the settled doctrine of the government from the beginning. If any other course were adopted, the tribes would soon be overwhelmed with civil litigation and judg-

ments. The civilized nations in the Indian Territory, as is pointed out in the Thebo Case, are probably better guarded against oppression from this source than the states themselves, under the eleventh amendment of the Constitution; for the states may consent to be sued, but the United States has never given its permission that these Indian nations might be sued generally, even with their consent.

The complainant throughout this litigation has conceded the exemption of the Creek Nation from civil suit. That fact is put forward in the bill as the very ground for invoking equitable relief. It is there averred "that this plaintiff has no remedy at law by which he could sue the Creek Nation and recover from said Creek Nation the amount of unpaid salary due him under and by virtue of the contract of January 10, 1903, or for damages for the breach of said contract," and hence it is charged that he has no plain, speedy, or adequate remedy at law for his injuries, and therefore is entitled, on a familiar principle, to relief in equity. But the equitable doctrine invoked has no application to the facts of the present case. When the law out of considerations of public policy denies a remedy, equity cannot grant one. The defect of remedy which will support a resort to equity must lie in the legal remedy and not in the legal policy. An action for damages would afford a complete redress of complainant's grievance; but the courts are forbidden to grant the remedy because of the disastrous consequences that would result if the tribe were exposed to civil suit. It is the right, and not the remedy, that is deficient. To say that, when the law denies its remedies out of considerations of sound public policy, a party may have his claim enforced in equity, would be a scandal to our jurisprudence, and render equity less just than the law.

This whole subject has been frequently before the federal courts in attempts to enforce in equity pecuniary obligations against states at the suit of individuals, in violation of the exemption of the eleventh amendment. Such attempts have uniformly failed. The leading authority on the subject is Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128, 27 L. Ed. 448. That action was based upon refunding bonds issued by the state of Louisiana. The statute under which the bonds were issued levied an annual tax of 5½ mills on the dollar upon all property of the state to pay the principal and interest of the bonds, and set apart and appropriated the revenue derived therefrom to that purpose, and no other. It made the tax a continuing annual tax until the bonds were paid, principal and interest, and made the appropriation a continuing annual appropriation during the same period, and made it the duty of the auditor and treasurer of the state to collect the tax annually, and pay the interest and principal of the bonds. To divert any of the funds derived from this tax to any other purpose than paying the bonds or the interest thereon was made a felony. This act was passed in 1874, and, to provide further security to those who should surrender the old obligations of the state and accept the refunding bonds, the main features of the statute were embodied in a constitutional amendment, and were there declared to create a valid contract between the state and each and every holder of the bonds "which the state shall by no means, and in nowise impair." In 1880 the state

adopted a new Constitution, and embodied articles therein which amounted to a repudiation of these bonds in many of their essential features. In the meantime, however, taxes had been levied under the earlier statute, and collected, and a fund of $300,000 was in the treasury of the state derived therefrom, and large amounts of other taxes levied for the same purpose were still uncollected. A suit in equity was brought against the fiscal officers of the state by holders of these bonds, in which it was sought to have the provisions of the Constitution of 1880 declared null and void as impairing the obligation of the state's contract, in violation of the federal Constitution, and restraining the state officers from failing to carry out the provisions of the earlier enactments. At the same time time a suit at law was instituted in which a mandamus was asked requiring these officers to apply the funds in their hands to the extinguishment of the bonds and coupons held by the complainant. The Supreme Court upon a full examination of the subject held that these were suits against the state, in violation of the eleventh amendment to the federal Constitution. Much was made in that case of the fact that the moneys had been collected under the earlier enactments, and were held in the treasury appropriated to the payment of complainant's bonds, and that the money so held was a "trust fund" which neither the state nor its officers could withhold from the original purpose of the levy. The case was much stronger in this feature than the present case, for here nothing has been done but to make a general appropriation out of the funds in the treasury of the Creek Nation for the payment of the salary of national attorney. The court held that such an appropriation did not make the money in the treasury a "fund" within the meaning of that term as used in equity jurisprudence; that such an appropriation was a matter wholly between the state and its officers, and gave the complainants no right to the money as a trust fund. Chief Justice Waite, speaking for the court, summed the matter up tersely as follows:

"The officers owe duty to the state alone, and have no contract relations with the bondholders. They can be moved through the state, but not the state through them."

The whole doctrine was again examined by Mr. Justice Matthews in the case of In re Ayers, 123 U. S. 502, 8 Sup. Ct. 181, 31 L. Ed. 216:

"Admitting all that is claimed on the part of the complainants as to the breach of its contract on the part of the state of Virginia by the acts of its General Assembly referred to in the bill of complaint, there is nevertheless no foundation in law for the relief asked. For a breach of its contract by the state, it is conceded there is no remedy, by suit against the state itself. This results from the eleventh amendment to the Constitution, which secures to the state immunity from suit by individual citizens of other states or aliens. This immunity includes not only direct actions for damages for the breach of the contract brought against the state by name, but all other actions and suits against it, whether at law or in equity. A bill in equity for the specific performance of the contract against the state by name, it is admitted, could not be brought. In Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608, 29 L. Ed. 805, it was decided that in such a bill, where the state was not nominally a party to the record, brought against its officers and agents, having no personal interest in the subject-matter of the suit, and defending only as representing the state, where 'the things required by the decree to be done and performed are the very things which, when done and performed,

constitute a performance of the alleged contract by the state,' the court was without jurisdiction, because it was a suit against a state."

Again, the same learned judge says, page 504 of 123 U. S., page 182 of 8 Sup. Ct. (31 L. Ed. 216):

"But where the contract is between the individual and the state, no action will lie against the state, and any action founded upon it against defendants who are officers of the state, the object of which is to enforce its specific performance by compelling those things to be done by the defendants which, when done, would constitute a performance by the state, or to forbid the doing of those things which, if done, would be merely breaches of the contract by the state, is in substance a suit against the state itself, and equally within the prohibition of the Constitution."

The present suit comes squarely within this language. It is a suit for the specific performance of a contract of personal service. Performance of that contract on the part of the Creek Nation consisted in paying the compensation which it provided, and on the part of Mr. Murphy it consisted in rendering the service mentioned in the contract. It is elementary law that a suit in equity for specific performance will not lie as to such a contract. There are two controlling reasons why this is so: First, the remedy at law is adequate; and, second, it would be impossible for a court of equity to supervise the many acts which would constitute performance by the defendant. If we look at the contract from the other side, it will be manifest that the present case falls within the second reason as well as the first. Suppose Mr. Murphy had violated the contract by refusing to render the service mentioned therein, could the Creek Nation have maintained a bill in equity to compel him to perform those services? Manifestly not. No more can he maintain a bill in equity to compel the Creek Nation to pay the compensation which the contract provides. The defendant Porter had no personal interest in any of the matters embraced in the bill. In discharging the complainant he acted in his official capacity, exercising a discretion with which he was clothed by law. If there was just cause for what he did, the contract was not violated. If he erred in the exercise of his official discretion, then he violated complainant's right under the contract, and would have subjected the Creek Nation to an action for damages had it not been for the exemption already considered. The exercise of his official discretion cannot be reviewed in court farther than to declare whether the contract was or was not violated. Even if his conduct was arbitrary, it could produce no result except the violation of the contract, and could not justify a resort to equity either for the purpose of having the complainant reinstated in the employment, or enforcing payment of his salary. The relationship of attorney and client is such as to require perfect confidence between the parties, and, of course, could not be continued by a decree in equity against the will of either party.

Section 2 of the act of June 28, 1898, c. 517, 30 Stat. 495, commonly known as the "Curtis Act," provides that:

"When in the progress of any civil suit pending in the United States court in any district in said territory, it shall appear to the court that the property of any tribe is in any way affected by the issues being heard, said court is hereby authorized and required to make said tribe a party to said suit."

By reason of this statute it is urged by defendants that the Creek Nation is an indispensable party in the present case. We do not think such is the true intent of that law. One of the prominent features of the Curtis act was to settle by suits between the Five Civilized Tribes, and private individuals, as well as by suits between such private individuals, the right to membership in the tribe, and as a result of such membership the right to share in the tribal funds and lands. It is a matter of general knowledge that many nonmembers were in possession of the valuable lands of Indian Territory, under fraudulent claims of title, and illegal claims of membership in the tribe. Much litigation on these subjects was pending between private individuals at the time the act was passed, and the act itself authorized the bringing of suits both by the tribes, and by the individual members thereof, for the ouster of trespassers from the tribal lands, and the adjudication of the right of membership in the tribes. In such litigation between individuals it would necessarily occur that the rights of the tribe to tribal lands and tribal funds would be, either directly or indirectly, involved. Such rights of the tribe might also be seriously prejudiced by collusive suits between individuals. In order that these questions might be finally settled so as to protect both individuals and the tribe, the provision of the statute above quoted was enacted. It was never intended in this indirect way to abolish the exemption of the tribe from civil suit. This court declared in the Thebo Case that "the intention of Congress to confer such a jurisdiction upon any court would have to be expressed in plain and unambiguous terms." If the interpretation suggested were to be adopted, it would always be possible for a private person having a claim against the tribe to sue the officer having control of its funds, and then ask that the tribe be brought in as a necessary party under this statute. We cannot believe that it was the intent of Congress, in this indirect manner, to abrogate a settled policy which has hitherto been deemed essential for the protection of these dependent tribes against the schemes of the unscrupulous.

There are three sound reasons why the demurrer to the bill in this cause should have been sustained: First, the remedy at law was adequate, were it not for the exemption of the Creek Nation from civil suit. Second, the contract is one for professional service, and cannot be specifically enforced in equity at the suit of either party. Third, the suit, though nominally against an officer, is in fact against the Creek Nation, and cannot be sustained without violating the exemption of that nation from civil suit.

The moneys received by the clerk of the trial court as an alleged salary accruing to the complainant should be returned to the defendant Adams, or to the proper officer, representative or successor in interest of the Creek Nation, unless the defendant Adams has already made restitution to that nation or to its successor in interest, and then the bill should be dismissed.

The decrees of the courts in the Indian Territory are reversed, and the cause is remanded to the Supreme Court of the state of Oklahoma for further proceedings not inconsistent with this opinion.