246 F.2d 293
 Henry Thomas HAILE, Jr., individually, and as Administrator of the estate of Agnes Lewis Haile, Deceased, et al., Appellants,
v.
Osley Bird SAUNOOKE, Bertha Saunooke, The Eastern Band of Cherokee Indians, a Corporation, and the United States, in its capacity as a government and also as trustee for and guardian of The Eastern Band of Cherokee Indians and the individual members thereof, Appellees.
 No. 7418.
 United States Court of Appeals Fourth Circuit.
 Argued May 28, 1957.
 Decided July 13, 1957.
 
 Thomas A. Uzzell, Jr., Asheville, N. C. (Uzzell & DuMont, Asheville, N. C., Folts, Brammer, Bishop & Thomas, Chattanooga, Tenn., and O. L. Anderson, Murphy, N. C., on the brief), for appellants.
 Frank M. Parker, Asheville, N. C., and William W. Ross, Atty., Dept. of Justice, Washington, D. C. (George H. Ward, Asheville, N. C., and George Cochran Doub, Asst. Atty. Gen., J. M. Baley, Jr., U. S. Atty., Marshall, N. C., and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellees.
 Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.
 PARKER, Chief Judge.
 
 
 1
 This is an action to recover damages for personal injuries sustained from the collapse of a swinging bridge over the Oconaluftee River on the Cherokee Indian Reservation in Swain County, North Carolina. The plaintiffs are citizens of Tennessee who were on a visit to the reservation and who were crossing the bridge to reach a tourist attraction operated by Osley Bird Saunooke and his wife, members of the Eastern Band of Cherokee Indians. Saunooke and wife were named as defendants in the action along with the Eastern Band of Cherokee Indians and the United States "in its capacity as a government and also as trustee for and guardian of the Eastern Band of Cherokee Indians and the individual members thereof." The District Judge dismissed the action against the Eastern Band of Cherokee Indians and against the United States as trustee for and guardian of the band and the individual members thereof, but retained the action against the individual defendants and against the United States, other than as trustee and guardian, and allowed the United States additional time within which to plead to the complaint. He signed an order under Rule 54(b), Fed.Rules Civ.Proc. 28 U.S.C.A. severing from the action for purposes of appeal the cause of action as to which dismissal was entered, so as to allow immediate appeal from the order of dismissal and the plaintiffs have appealed therefrom.
 
 
 2
 It is to be noted that the action was not dismissed as to the individual defendants nor as to the United States, which might be liable under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., upon a proper showing of negligence on the part of its employees in the construction or maintenance of the bridge; but the dismissal extended only to the cause of action asserted against the Eastern Band of Cherokee Indians and against the United States as trustee or guardian for them. As recovery is sought against the United States under the Federal Tort Claims Act for negligence of its employees in connection with the bridge, it is clear that the suit against it in its capacity as trustee for or guardian of the Indians could only be for the purpose of notifying it to defend the suit for them pursuant to Rule 17(c) of the Rules of Civil Procedure, or for the purpose of rendering any judgment which might be entered in the cause binding with respect to the property of the Indians which the government held for them as trustee or guardian.
 
 
 3
 It is well settled that the Eastern Band of Cherokee Indians is an Indian Tribe within the meaning of the Constitution and laws of the United States. In United States v. Wright, 4 Cir., 53 F.2d 300, 303 we went carefully into the history of this remnant of the Cherokees of North Carolina and showed how they had acquired the lands upon which they were living and had reacquired their status as an Indian Tribe under the protection of the Government of the United States. We made reference to their recognition as a tribe by Congress in the Act of July 27, 1868, saying:
 
 
 4
 "By the purchases of Thomas, therefore, this Eastern Band of Cherokees had acquired the right to the possession of a large boundary of land in North Carolina, and by the North Carolina statute of 1866 they had acquired, with the approval of the government of the United States, permission to remain permanently in that state. Their economic status had thus been practically restored to what it was prior to the Treaty of New Echota; and Congress in the act of July 27, 1868, 15 Stat. 228, recognized this status by providing that the Secretary of the Interior should cause a new roll or census to be made `of the North Carolina or Eastern Cherokees,' and that thereafter the Secretary of the Interior should `cause the Commissioner of Indian Affairs to take the same supervisory charge of the Eastern or North Carolina Cherokees as of other tribes of Indians.' (Italics ours.)"
 
 
 5
 We pointed out how the lands of these Indians had been conveyed by the Commissioner of Indian Affairs to the corporation created by the Legislature of North Carolina under a decree which provided that nothing therein should "be construed as interfering with the right of the Commissioner of Indian Affairs from exercising such supervisory charge over the person and property of said band of Indians and the members thereof and the contracts of said Indians as that officer now has by virtue of the Constitution of the United States and the treaties and laws in pursuance thereof." We pointed out also that the deed of the Commissioner of Indian Affairs contained the same proviso and that the title remained in the corporation until conveyed to the United States on July 21, 1925 pursuant to the provisions of the Act of June 4, 1924, 25 U.S.C.A. § 331 note. With respect to the guardianship exercised over this band of Indians by the United States, we said:
 
 
 6
 "Not only with respect to the acquisition and preservation of the title to this land, but also in practically every other way imaginable, the government of the United States from 1868 to the present day has continuously guarded and protected the interests of this band of Indians, and has done everything possible to promote their progress and development. It has supervised their contracts and instituted suits for the cancellation of contracts which were thought not advantageous to them. United States v. Boyd, C.C., 68 F. 577; Id., 4 Cir., 83 F. 547. It has appointed agents to guide them in the management of their affairs. It has built schools, including a large boarding school, and provided teachers for the education of their children. It has provided an experienced farmer to go among them and teach them the arts of agriculture. It has provided a hospital for the care of their sick, and has made provision for the care of their deaf, dumb, blind, and insane. It has provided a physician and a field nurse to go among them and care for the sick in their homes. It has furnished food and clothes for their school children, and has made allowances to members of the tribe to aid in their support. In other words, it has for more than sixty years treated them in all respects as wards of the nation, and has expended in recent years more than $100,000 annually for their support. It appears that for the fiscal year 1930 the appropriation for this purpose was approximately $135,000.
 
 
 7
 "* * * the life of this band of Indians, from an economic standpoint, both in its relation to the federal government and to the state, has been for more than sixty years practically that of other Indian tribes. Politically they have been subject to the laws of the state, but economically they have been wards of the federal government and cared for as such under the provisions of its laws."
 
 
 8
 The court expressly answered the argument, now made again, that the Eastern Band of Cherokee Indians had lost their status as an Indian Tribe by reason of their separation from the main body of the Cherokees that had gone to the Indian Territory, saying:
 
 
 9
 "The fact that the Eastern Band of Cherokee Indians had surrendered the right to their tribal lands, had separated themselves from their tribe, and had become subject to the laws of the state of North Carolina, did not destroy the right or the duty of guardianship on the part of the federal government. The fact that they constituted a community of these aboriginal people who were wards of the government was sufficient basis for the exercise of the power; and to what extent the power should be exercised was for Congress to decide. Even the conferring of citizenship upon the Indians and allotment of lands to them in severalty does not place them beyond the reach of congressional regulations adopted for their protection. United States v. Sandoval, supra [231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107]; Tiger v. Western Inv. Co., 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738; Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820; United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192; Brader v. James, 246 U.S. 88, 96, 38 S.Ct. 285, 62 L.Ed. 591. And the principle is well settled that whether the protective and regulatory power of Congress shall be extended over an Indian community is a political question with the determination of which the courts have no power to interfere. United States v. Holliday, 3 Wall. 407, 419, 18 L. Ed. 182; Tiger v. Western Inv. Co., supra; United States v. Sandoval, supra; Sisseton & Wahpeton Bands of Sioux Indians v. United States, supra [277 U.S. 424, 48 S. Ct. 536, 72 L.Ed. 939]. * * *
 
 
 10
 "In this case there can be no question but that the Eastern Band of Cherokee Indians is a distinctly Indian community. Congress for more than half a century has recognized it as such, and has extended to it the guardianship and protection of the government. In the opinion of Assistant Attorney General Campbell in 1904 approved by Secretary Hitchcock (copied in the record at pages 117-141) is contained a summary of the acts of Congress passed up to that time for the care and protection of the band, and the Assistant Attorney General thus summarizes his conclusions with regard thereto: `From the foregoing necessarily prolix recitals it is manifest that the government has all along exercised a supervisory control over this band of Indians both in matters growing out of the treaties with the Cherokee Nation proper and the relations of the band itself involving the approval and disapproval of deeds and contracts with respect to the acquisition and sale of their lands and the disposal of the timber thereon. Since 1868, under specific legislation, the same supervisory charge has been taken of the Eastern Band of Cherokee Indians of North Carolina as of other tribes of Indians. There is nothing in recent legislation nor in the decrees of the courts to warrant the adoption of a different course or policy in regard to them. On the contrary the courts fully recognize such authority and decline to interfere with its exercise, thus conceding that it exists nowhere else.'"
 
 
 11
 In United States v. Boyd, 4 Cir., 83 F. 547, 555, this court dealt with a suit instituted by the United States to declare void a timber contract entered into by the band. In holding that even in the absence of fraud a contract not approved by the Department of the Interior would not be enforced, Judge Goff, after reciting various acts of Congress showing that the government was exercising the right of guardianship over the affairs of the band, said:
 
 
 12
 "This shows that the original condition of the Indians in this country — that of pupilage under the government — has not been released, so far as this Eastern Band of Cherokees is concerned. It thus appears that the political departments of the government have recognized these Indians as constituting a tribe, — at least, within the meaning of that word as it is used in the constitution of the United States; and it is a rule of the courts, in matters of this kind, to follow the action of the executive and the departments whose duty it is to determine such affairs."
 
 
 13
 For other decisions of this court holding the Eastern Band of Cherokee Indians to be an Indian tribe within the meaning of the Constitution and Laws of the United States, see United States v. Colvard, 4 Cir., 89 F.2d 312; United States v. 7,405.3 Acres of Land in Macon, Clay, and Swain Counties, North Carolina, 4 Cir., 97 F.2d 417; Blair v. McAlhaney, 4 Cir., 123 F.2d 142; United States v. Parton, 4 Cir., 132 F.2d 886.
 
 
 14
 The rule that a tribe of Indians under the tutelage of the United States is not subject to suit without the consent of Congress is too well settled to admit of argument. Thebo v. Choctaw Tribe of Indians, 8 Cir., 66 F. 372; Adams v. Murphy, 8 Cir., 165 F. 304, 308; Turner v. United States, 248 U.S. 354, 358, 39 S.Ct. 109, 63 L.Ed. 291; United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 656, 84 L.Ed. 894. In the case last cited the Supreme Court said:
 
 
 15
 "The public policy which exempted the dependent as well as the dominant sovereignties from suit without consent continues this immunity even after dissolution of the tribal government. These Indian Nations are exempt from suit without Congressional authorization. It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did."
 
 
 16
 In Rollins v. Eastern Band of Cherokee Indians, 87 N.C. 229, the Supreme Court of North Carolina rendered a decision to the same effect, refusing to entertain a suit against this very band of Indians on the ground that they were under the guardianship of the federal government. The court said of the Act of Congress of July 15, 1870 (16 Stat. 362, sec. 11), that, if it did not confer, it recognized a corporate capacity in them as a collective body or tribe. It said further: "The remnant band of Cherokees remaining in the state, by distinct legislative action, have been placed upon the same footing with other Indian tribes, under the protection and care of the government, and these statutory provisions [i.e. those for the protection of Indians] apply with equal pertinency and force to them as to that portion of the tribe who have emigrated, and been located in their western home. * * * It is obvious that the Indian tribes are in a state of pupilage to the general government, and the safe-guards of law are placed over them to secure them and their property from the artful practices of designing men, the dictate of an enlightened sense of national duty to the weak and defenseless of a race rapidly diminishing in numbers, and deemed incapable of self-protection."
 
 
 17
 The arguments offered in support of the right to sue this band of Indians, either directly or through the United States as trustee and guardian, merit but brief answer. It is said that the right to sue the band is given by the act of the Legislature of North Carolina incorporating the band; but it is perfectly clear that an act of a state legislature cannot be allowed to interfere with the guardianship over these people which the United States has assumed, since Congress alone must determine the extent to which the immunities and protection afforded by tribal status are to be withdrawn. See Tiger v. Western Investment Co., 221 U.S. 286, 31 S.Ct. 578, 55 L.Ed. 738; United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L. Ed. 1192; Brader v. James, 246 U.S. 88, 38 S.Ct. 285, 62 L.Ed. 591; United States v. McGowan, 302 U.S. 535, 538, 58 S.Ct. 286, 82 L.Ed. 410; Board of Commissioners, etc. v. Seber, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094.
 
 
 18
 In the absence of consent by Congress that these wards of the government be sued, it is not permissible to accomplish the same result indirectly by suing the United States as trustee or guardian for them. Turner v. United States, supra, 248 U.S. 354, 359, 39 S. Ct. 109, 63 L.Ed. 291. There is nothing in the federal Tort Claims Act which authorizes any such suit. That act authorizes suit against the government for damages caused by an employee of the government acting within the scope of his office or employment, not a suit against wards of the government nor against the government as their guardian for damages resulting from their acts, and the position of plaintiffs is not helped by reference to the Uniform Trusts Act. G.S. of North Carolina, § 36-37. Aside from the fact that the Uniform Trusts Act does not purport to render the trustee liable for the torts of the cestui que trust, it is clear, as pointed out above, that only Congress can determine the extent to which the immunities and protection afforded by tribal status are to be withdrawn.
 
 
 19
 The suit against the Eastern Band of Cherokee Indians and against the government in its capacity as guardian or trustee was properly dismissed; but, as heretofore stated, this will not preclude plaintiffs from proceeding against the individual defendants, nor against the government itself, if they can show damages resulting from any negligent or wrongful act or omission of any employee of the government acting within the scope of his office or employment.
 
 
 20
 Plaintiffs contend that they are entitled to judgment by default against the United States in its sovereign capacity; but that question is not before us on the appeal from the order of dismissal and is without merit in any event, as the trial judge was acting well within his discretion in extending the time of the United States to file answer until after the questions raised by this appeal should be decided.
 
 
 21
 Affirmed.