John S. BOTTOMLY, Plaintiff, Appellant,

v.

PASSAMAQUODDY TRIBE et al., Defendants, Appellees.

No. 78–1515.

United States Court of Appeals, First Circuit.

Argued March 13, 1979.

Decided May 17, 1979.

Donald H. Marden, Augusta, Maine, with whom John S. Bottomly, Millis, Maine, was on brief, for appellant.

Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., were on brief, for the United States, appellee.

Thomas N. Tureen, Calais, Maine, with whom Richard B. Collins, Window Rock, Ariz., was on brief, for Passamaquoddy Tribe, John Stevens and Eugene Francis, appellees.

John M. R. Paterson, Deputy Atty. Gen., Augusta, Maine, with whom David Roseman, Asst. Atty. Gen., Augusta, Maine, was on brief, for the State of Maine, amicus curiae.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

COFFIN, Chief Judge.

This is a diversity action brought by an attorney against the Passamaquoddy Tribe and three of its former tribal governors to recover on a contingency contract for attorney's fees. After argument on a defense motion to dismiss, the district court found that the Tribe and its officers were protected from suit by the doctrine of sovereign immunity, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *Puyallup Tribe v. Washington Department of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), and accordingly

* Of the District of Rhode Island, sitting by desig-

dismissed for want of jurisdiction.[1] Appellant contends that the court erred by failing to hold an evidentiary hearing, maintaining that it could not properly have reached its decision without first hearing facts that show the Passamaquoddy Indians to be "a tribe in a legal sense entitled to immunity." Finding no error in the court's disposition of this suit, we affirm the judgment below.

According to appellant's amended complaint, in 1968 he entered into an agreement with one Don C. Gellers, an attorney who purported to represent the Tribe under the terms of a contingency fee contract. Pursuant to the attorneys' agreement, which apparently was approved by the chiefs of the Tribe, appellant was to serve as Massachusetts counsel in the Tribe's claim against the Commonwealth for an accounting on a trust fund. Both he and Gellers sought federal approval of their representation of the Tribe, as mandated by 25 U.S.C. § 81, but it was not forthcoming.[2] Nevertheless, appellant allegedly continued to perform legal services for the Tribe until 1971 when he was notified by the Tribe that Gellers, who by that time had been convicted of illegal possession of marijuana, no longer represented it. Claiming that other counsel for the Tribe then allowed the Massachusetts case to be dismissed, appellant brought this suit to recover for the work which he had performed for the Passamaquoddy.

The terms of Gellers' contract with the Tribe, upon which his claim ultimately is grounded, appear expressly to bar appellant's suit as an associated attorney against the Tribe:

> "It is agreed that the ATTORNEY [Gellers] . . . may associate with him in work under this contract such attorney or attorneys as he may select: *PROVIDED, that neither the Tribe nor the Government is to be at any expense by reason of the aforesaid employment of such associate attorneys,* all compensation thereof to be paid by the ATTORNEY out of any compensation which he may receive for his services." (Emphasis added.)

Moreover, appellant's suit, a claim pursuant to a contingency fee agreement, faces the obvious hurdle that neither he nor Gellers was able, for whatever reasons, to bring their representation of the Tribe to a successful resolution either in court or by way of settlement. But while this case thus strikes us as a particularly unlikely vehicle for raising what are complex questions of tribal status and immunity, questions which have pulled both the State of Maine and the United States, no longer parties, into the appellate fray, the merits of the contract claim are not before us. Accordingly we turn to the district court's dismissal on the grounds of tribal sovereign immunity.

## I. Tribal Status of the Passamaquoddy Indians

We begin by resolving what this case does not decide, namely, whether or not the Passamaquoddy Indians are a "tribe" as opposed to merely an "ethnic association".[3] The possibility that this threshold question,

---

1. Suit was also brought against the United States, the State of Maine and appellant's co-counsel, Gellers. The district court dismissed the suit against these defendants respectively on the grounds of sovereign immunity, the Eleventh Amendment and failure to complete service of process. These dismissals are not challenged on appeal.

2. The Department of Interior refused to approve the contract, believing 25 U.S.C. § 81 to be inapplicable to appellant's representation of the Tribe. This refusal was based on what was then the Department's position with respect to the Passamaquoddy, that the federal government had no "special relationship" with the Tribe and thus that "the Federal Indian laws do not apply to them." Our decision in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975), subsequently rejected this position, finding that the United States does have a trust relationship with the Tribe based on the Indian Non-intercourse Act, 25 U.S.C. § 177.

3. Our earlier decision involving the Passamaquoddy Indians, *Joint Tribal Council of the Passamaquoddy Indians v. Morton, supra,* also did not resolve the question of their tribal status. There it had been stipulated below that the "Passamaquoddy Tribe is a tribe in both the racial and cultural sense". 528 F.2d at 377 n. 7.

which could have disposed of the issue of tribal immunity from suit, was in issue arose not in the complaint, nor in the amended complaint, but in argument before the district court. The court, ruling from the bench, described the argument and responded as follows:

> "At oral argument, [counsel] has argued ingeniously and persuasively that perhaps this Tribe may not be a tribe, and if it is not a tribe, it is something else, and the individual members of the Tribe as members of an association might be subject to suit. The amended complaint, however, quite clearly asserts claims against the Tribe as an entity. The Court suggests that the plaintiff cannot have it both ways and is committed by the allegations of the amended complaint."

The State of Maine, appearing as amicus, contests this aspect of the court's ruling far more vigorously than does the appellant himself,[4] describing it as a finding that Congress had recognized the Passamaquoddy Indians as a tribe, a finding for which the court had no foundation. In addition, the state argues that granting defendants' motion to dismiss was "tantamount to permitting the group of Indians known as the Passamaquoddy Tribe" to claim for itself tribal status and all the benefits which that status confers. The state, we believe, misconstrues the court's action. The court made no ruling whatsoever on the Passamaquoddy Indians' tribal status. It merely found that the plaintiff had brought suit against the Tribe as such, rather than individual members of some association of Indians, and that it would not permit plaintiff, who had an opportunity to file and had filed an amended complaint after defendants had filed their motion to dismiss, to recast entirely his lawsuit at oral argument.

The state further contends that the court refused to consider the issue of tribal status simply because the complaint had used the label "tribe" to refer to the Passamaquoddy Indians. Such a refusal indeed would mark a return to the days of common law pleading when form reigned over substance, and a substantial claim could be lost for want of compliance with a technicality. *See Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); 5 Wright and Miller, Federal Practice and Procedure §§ 1181–82, 1202 (1969). But we are not faced with such a situation here. As the court correctly noted, the contingency contract for fees between the Tribe and Gellers as well as the agreement between Gellers and appellant clearly were entered into with the Tribe as a tribe. The case into which Gellers and appellant allegedly put their efforts was for an accounting on a trust fund held by Massachusetts for the Tribe as a tribe. There is nothing in these contracts, or in appellant's complaint based upon them, that suggest that the individual Passamaquoddy Indians were parties to those contracts or made the subjects of suit by appellant. The suit therefore was in substance, not merely in form, solely against the Tribe as an entity. While appellant could have sued the Tribe as an entity and its members as individuals, thus having it "both ways", he did not do so. *Compare Puyallup Tribe v. Washington Department of Game, supra,* 433 U.S. at 168–70, 97 S.Ct. 2616. Although the rules of pleading have been relaxed considerably, they have yet to dispense with what is perhaps the most basic function of the complaint, that of notifying persons that they have been made defendants in a lawsuit. *See* 5 Wright and Miller, Federal Practice and Procedure § 1202 at 63 (1969). We conclude, as did the court below, that appellant clearly brought suit against the Tribe as an entity, and not

---

4. Appellant never squarely raises the issue in his brief, although in passing he suggests that that which was stipulated in *Joint Tribal Council of the Passamaquoddy Indians v. Morton, supra,* should have been a matter of proof here. *See* note 3, *supra.* We would merely note that this lack of emphasis is not surprising. While the State of Maine may have much to gain by a finding that the Passamaquoddy Indians are not a tribe, as appellant himself told the court below, such a finding is "self-defeating" for his case. Appellant could have scant hope of recovering substantial monetary damages out of the personal assets of the individual Passamaquoddy Indians.

as a collection of individuals. The Passamaquoddy Indians' tribal status therefore is to be assumed for purposes of deciding the issue squarely raised by this suit: whether this particular tribe enjoys protection from suit by virtue of sovereign immunity.

## II. Tribal Sovereign Immunity

As the Supreme Court, in *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 58, 98 S.Ct. at 1677, recently noted:

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. *Turner v. United States,* 248 U.S. 354, 358 [39 S.Ct. 109, 110, 63 L.Ed. 291] (1919); *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512–513 [60 S.Ct. 653, 656, 84 L.Ed. 894] (1940); *Puyallup Tribe v. Washington Department of Game,* 433 U.S. 165, 172–173 [97 S.Ct. 2616, 2620–2621, 53 L.Ed.2d 667] (1977). This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization,' the 'Indian Nations are exempt from suit.' *United States v. United States Fidelity and Guaranty Co., supra* [309 U.S. 506], at 512 [60 S.Ct. 653, 656, 84 L.Ed. 894]."

The district court, applying the doctrine of tribal sovereign immunity, dismissed the suit as to the Tribe and as to its representatives as well, who had been sued not in their individual capacities but as "having acted for and on behalf of the defendant Tribe." *Adams v. Murphy,* 165 F. 304 (8th Cir. 1908) (attorney barred from suing tribe and its officers to collect attorneys fees).

Appellant, while recognizing the possibility that the Tribe may be immune from suit, argues for what may be termed a sliding scale of sovereignty. Only those tribes which originally enjoyed and still exhibit sufficient indicia of sovereignty, he maintains, may claim the protection of this doctrine. Consequently he argues that a factual hearing was necessary to establish the Tribe's entitlement to immunity from suit. In the words of the State of Maine, which

has filed a lengthy historical exegesis in support of appellant's position:

"[T]he doctrine of sovereign immunity applies only to those tribes of Indians which have been federally recognized by treaty or by federal statute; the doctrine has never been applied to those Indian groups which are merely remnants or fragments of once independent tribes, such as are the Passamaquoddies. Since the Tribe has never been federally recognized by treaty or by statute, the defense of sovereign immunity does not apply to it."

In particular, the state points to the late eighteenth and early nineteenth centuries, when, it is argued, the federal government sharply distinguished between fierce warring tribes of the frontier dwelling in Indian country, with whom it dealt as independent sovereigns, entering into treaties and enacting legislation which governed relations with them, and the "remnants" of tribes, such as the Passamaquoddy who dwelt along the East Coast and who, largely ignored by the central government, fell within the protection of individual states or colonies.

■ Whatever the merits of the state's well-documented historical analysis, vigorously disputed by the Tribe, we find the conclusion which the state draws therefrom—that only the fierce independent tribes of the western frontier who have been "federally recognized" enjoy sovereign immunity—to be unpersuasive. The state's analysis is not unfamiliar to this court; it has been presented before, albeit in a slightly different context. In *Joint Tribal Council of the Passamaquoddy Tribe v. Morton, supra,* 528 F.2d at 370, the State of Maine, there appearing as intervenor, argued that the phrase "any . . . tribe of Indians" in the Indian Nonintercourse Act, 25 U.S.C. § 177, should be read narrowly to exclude the Passamaquoddy Indians who had never been "federally recognized". We noted that while the tribe had been dealt with extensively by the state, "[i]n contrast, the federal government's dealings with the Tribe have been few. It has nev-

er, since 1789, entered into a treaty with the Tribe, nor has Congress ever enacted any legislation mentioning the Tribe." *Id.* at 375. However, we rejected the claim that those facts established the Tribe's exclusion from the Nonintercourse Act, *id.,* at 378, finding instead that the case law "does not elevate recognition to a *sine qua non.*" *Cf. Mashpee Tribe v. New Seabury Corporation,* 592 F.2d 575, 581–82 (1st Cir. 1979) (absence of federal regulation, intermarriage and acculturation do "not necessarily mean that the Mashpees are not a tribe protected by federal law"). Although in the instant case the state argues that the Passamaquoddies are beyond the pale of a common law doctrine rather than a protective statute, our conclusion—that the distinctions drawn are not controlling—is the same. We are cited to, and our research has uncovered, no case which *conditions* the invocation of sovereign immunity on the factors emphasized by the state or appellant: formal federal recognition of the particular tribe by treaty or statute,[5] a prolonged course of dealing between the tribe and the federal government, geographic location, the tribe's warlike nature, the absence of state protection of a tribe or the continued full exercise of a tribe's sovereign powers.[6]

The absence of authority is not surprising, for the analysis urged by appellant and the state seems to us to fundamentally misconceive basic principles of federal Indian law. In effect, their approach would condition the exercise of an aspect of sovereignty on a showing that it had been granted to the tribe by the federal government, either by explicit recognition or implicitly through a course of dealing. As the Supreme Court recently explained, however, the proper analysis is just the reverse:

> "The powers of Indian tribes are, in general, *'inherent powers of a limited sovereignty which has never extinguished.'* F. Cohen, Handbook of Federal Indian Law 122 (1945) (emphasis in original) . . . ..

> "Indian tribes are, of course, no longer 'possessed of the full attributes of sovereignty.' . . . Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others.

---

5. The emphasis of appellant and the state on the absence of federal recognition or dealing with the Tribe has lost at least some of its force in the wake of *Joint Tribal Council of the Passamaquoddy Indians v. Morton, supra.* Since that case was decided, the Department of the Interior has sought and received congressional appropriations for the purpose of providing Bureau of Indian Affairs (BIA) services to the Tribe. Also, we are informed by the United States that:

    "[T]he Department of the Interior is about to publish in the Federal Register a list of tribes eligible for BIA services, and the Passamaquoddy Tribe will be on that list. The significance of that list is that tribes so listed are not required to petition the Secretary of the Interior for official acknowledgement of their tribal existence. See 25 C.F.R. 54.6(b), as set out in 34 Fed.Reg. 39361–39364."

    Whether or not these actions constitute adequate "federal recognition" under appellant's approach to immunity is an issue we do not decide, given our holding that a tribe need not prove that it has been "federally recognized" in order to assert its immunity from suit.

6. Indeed we are cited to cases involving tribes which did not exhibit these criteria and yet were protected from suit by the doctrine of sovereign immunity. For example, the Florida Seminole and the Eastern or North Carolina Cherokees, both situated outside Indian country, are immune from suit. *See Maryland Casualty Co. v. Citizens National Bank of West Hollywood,* 361 F.2d 517 (5th Cir. 1966); *Haile v. Saunooke,* 246 F.2d 293 (4th Cir. 1957). The Santa Clara Pueblo, whose immunity was recognized in *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) have been described as "sedentary rather than nomadic in their inclinations, and disposed to peace and industry". *United States v. Sandoval,* 231 U.S. 28, 39, 34 S.Ct. 1, 358 L.Ed. 107 (1913). And, the doctrine has expressly been held applicable "even after dissolution of the tribal government". *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940). *See Haile v. Saunooke, supra,* 246 F.2d at 296.

"But our cases recognize that the Indian tribes have not given up their full sovereignty. . . . The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. *In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status. . .*" *United States v. Wheeler,* 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (emphasis added).

It is uncontroverted that one aspect of a tribe's sovereignty is its immunity from suit. *Santa Clara Pueblo v. Martinez, supra,* 437 U.S. at 58, 98 S.Ct. 1670; *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Adams v. Murphy, supra,* 165 F. at 308. Accordingly, the only remaining questions are whether Congress has divested the Tribe of its sovereign immunity or whether it has been lost "by implication as a necessary result of [its] dependent status." *United States v. Wheeler, supra,* 435 U.S. at 323, 98 S.Ct. at 1086, *see Santa Clara Pueblo v. Martinez, supra,* 437 U.S. at 58–59, 98 S.Ct. 1670.

It is clear that Congress has taken no action to deprive the Passamaquoddy Indians of their inherent immunity from suit. Surely its inattention would not suffice. *See generally Joint Tribal Council of the Passamaquoddy Tribe v. Morton, supra,* 528 F.2d at 378, 380. And while the Court has found an "implicit divestiture of [a tribe's] sovereignty", *United States v. Wheeler, supra,* 435 U.S. at 326, 98 S.Ct. at 1087, in a number of areas such as free alienation of Indian land to non-Indians, *Oneida Indian Nation v. County of Oneida,* 414 U.S. at 661, 667–68, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), and trial of non-members of a tribe in tribal courts, *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 195, 98 S.Ct. 1011, 55 L.Ed.2d 509 (1978), the contrary must be the case here. The mere passage of time with its erosion of the full exercise of the sovereign powers of a tribal organization cannot constitute such an implicit divestiture. As the Court has held, "[t]he public policy which exempted the dependent as well as the dominant sovereignties from suit without consent continues this immunity even after dissolution of the tribal government. These Indian Nations are exempt from suit without Congressional authorization." *United States v. United States Fidelity & Guaranty Co., supra,* 309 U.S. at 512.

Within this framework of analysis, we fail to see how the state's extensive involvement with the Tribe, *see Joint Tribal Council of the Passamaquoddy Tribe v. Morton, supra,* 528 F.2d at 374, can deprive the Tribe of its immunity from suit. The case law discussed herein leaves no doubt that a state cannot take action to divest a tribe of its immunity. *See Haile v. Saunooke,* 246 F.2d 293, 297–98 (4th Cir. 1957). And no argument can be made here that the Tribe somehow has consented to suit or waived its right to assert its immunity. "If all or nearly all members of a tribe chose to abandon the tribe, then, it follows, the tribe would disappear", *Mashpee Tribe v. New Seabury Corporation, supra,* 592 F.2d at 587, and with it, of course, immunity from suit. But the Tribe's mere acceptance of benefits conferred upon it by the state cannot be considered a voluntary abandonment of its sovereignty and its attendant immunity from suit. *See id.* at 585–87. "It is settled that a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at 58, 98 S.Ct. at 1677, *quoting United States v. Teston,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

■■ We conclude that the doctrine of sovereign immunity bars the instant suit against the Tribe. Because we have found that the factual issues on which appellant claims a hearing were necessary—express federal recognition, location, state protection, etc.—are not relevant to a tribe's entitlement to immunity from suit, the court below did not err by dismissing the case without such a hearing.

The court also committed no error in dismissing the case as against the representatives of the Tribe. As the court properly found, the complaint in its original form and as amended, gave no suggestion that this was a suit against these persons for actions taken in their individual capacities. Instead, they were sued as having acted "for and on behalf of the tribe", and "[t]o say that this tribe is exempt from civil suit on its contracts, and yet compel its principal chief[s], by judicial process, to take funds from its treasury, and turn them over to the court to be applied in discharge of its contracts, is to destroy in practice the very exemption which at the outset is conceded as a legal right." *Adams v. Murphy, supra*, 165 F. at 308; *see Means v. Wilson*, 383 F.Supp. 378, 382 (D.S.Dak.1974), *aff'd in part and rev'd in part on other grounds*, 522 F.2d 833 (8th Cir. 1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); *Seneca Constitutional Rights Organization v. George*, 348 F.Supp. 48, 50 (W.D.N.Y.1972).

*Affirmed.*